**LNP ENGINEERING PLASTICS, INC., and Kawasaki Chemical Holding Co., Inc., Plaintiffs,**

**v.**

**MILLER WASTE MILLS, INC., Trading as RTP Company, Defendant.**

**No. Civ.A. 96–462–RRM.**

United States District Court, D. Delaware.

Dec. 17, 1999.

516

Josy W. Ingersoll, and John W. Shaw, Young Conaway Stargatt & Taylor, Wilmington, DE, Thomas B. Kenworthy, David W. Cromley, and John V. Gorman, Morgan, Lewis & Bockius, Philadelphia, Pennsylvania; William W. Schwarze, and Lynda L. Calderone, Panitch Schwarze Jacobs & Nadel, Philadelphia, PA, for Plaintiffs.

Donald F. Parsons, Jr., and Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Raphael V. Lupo, Donna M. Tanguay, and Mark G. Davis, McDermott, Will & Emery, Washington, DC, Margaret M. Duncan, and John G. Bisbikis, McDermott, Will & Emery, Chicago, IL, for defendant.

## OPINION

McKELVIE, District Judge.

This is a patent case. Plaintiff LNP Engineering Plastics, Inc. is a Delaware

corporation with its principal place of business in Exton, Pennsylvania. Plaintiff Kawasaki Chemical Holding Co., Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware. Kawasaki is the owner of U.S. Patent Nos. 4,559,262 (the '262 patent); 5,019,450 (the '450 patent); and 5,213,889 (the '889 patent). LNP is the exclusive licensee of much of the technology covered by the three patents at issue. Defendant Miller Waste Mills, Inc. is a Minnesota corporation with its principal place of business in Winona, Minnesota. Miller Waste Mills trades as RTP Company.

On September 16, 1996, LNP filed a complaint alleging that RTP infringes the '262 patent, the '450 patent, and the '889 patent. LNP amended its complaint on December 6, 1996, adding Kawasaki as a plaintiff. On December 22, 1997, the court denied various jurisdictional challenges to the suit. On November 5, 1998, the court issued its *Markman* Opinion construing disputed claims of the patents at issue.

The case proceeded to a nine-day jury trial beginning on November 12, 1998. The jury returned a verdict finding the three asserted claims invalid and noninfringed. Thereafter, both parties filed post-trial motions. This is the court's decision on the motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The court finds the following facts from the patents at issue, their prosecution history, and the evidence presented at trial.

### A. The Parties

Imperial Chemical Industries, PLC ("ICI") is based in London, England. Under ICI's employ, Frederic N. Cogswell, David J. Hezzell, and Peter J. Williams developed a number of inventions relating to fiber-reinforced plastics. The inventors applied for United States patents, and the United States Patent and Trademark Office (PTO) issued the '262, '450, and '889 patents on December 17, 1985; May 28,

1991; and May 25, 1993, respectively. The three patents were assigned to ICI.

On October 3, 1991, ICI granted Kawasaki a license to make, use, or sell the technology covered by the '262 and '450 patents. On December 1, 1992, Kawasaki granted LNP a license to develop this same technology. On September 14, 1995, ICI assigned its interest in these three patents to Kawasaki and filed a "Notice of Recordation of Assignment Document" with the PTO. And on August 1, 1995, Kawasaki and LNP amended their licensing agreement to include rights to use the technology claimed in the '889 patent.

Miller Waste Mills manufactures and sells engineering plastic products. Miller Waste has previously conducted business under the name Fiberite Corporation. Fiberite was acquired in 1980 by Beatrice Chemical, which had previously acquired LNP. Because of antitrust concerns, in 1981 the government forced Fiberite to divest itself of its long fiber reinforced thermoplastics (LFRTs) division, RTP. RTP thus became an independent company, and it retained the intellectual property rights of Fiberite relating to LFRT production.

The trial testimony mentions two other firms that produce LFRTs. Polymer Composites, Incorporated ("PCI"), a Minnesota company, was founded by a Fiberite employee named Ronald Hawley. PCI was acquired by Hoechst Celanese in 1988.

Fiberfil Company, based in Evansville, Indiana, was a division of Dart Industries. Fiberfil employed inventors named Kiyoshi Hattori and Rexford Bradt, whose patents constitute prior art for the patents in suit. In 1981, Fiberfil merged with Wilson Products to become Wilson–Fiberfil, and then changed its name to DSM Engineering Plastics.

### B. The Technology

#### 1. Development of Long–Fiber Reinforced Thermoplastics

All three patents at issue pertain to a special type of plastic known as long fiber

reinforced thermoplastic, or LFRT. As explained at trial by Frederic Cogswell, one of the inventors of the claimed technology, thermoplastics are materials that become malleable when heated and that can be repeatedly reprocessed. These materials can be reinforced with fibers, typically glass or carbon, to render the plastic stiffer and stronger. Ultrastrong LFRTs are employed in applications such as the flooring of military aircraft, where they must withstand the impact of ammunition cases and infantrymen's boots. LFRTs also have more common uses, such as in snowshovel handles and manhole covers. Due to the thermoplastic qualities of LFRTs, the plastics can be salvaged from manufactured goods and reprocessed.

Two factors help determine the stiffness of reinforced plastics: the length of the fiber filaments, and the degree to which the filaments are "wetted" by the thermoplastic resin. "Wetting" refers to the extent to which the plastic resin surrounds the individual reinforcement filaments. According to Cogswell, fiber-reinforced plastics have been employed since the 1950s. He explained that long-fiber plastics were known, but that the fibers were poorly wetted, with bundles of filaments just coated with polymer. Short-fiber plastics were also known, and although the filaments therein were well wetted, the shortness of the fibers did not allow for sufficiently strong products. Cogswell testified that the artisans of the time believed that well-wetted long fiber reinforced plastics could not be made, and that, even if they could be made, the resultant plastics would have bad properties, such as brittleness and the inability to pass smoothly through an injection molding machine.

Cogswell testified that he and his colleagues developed new techniques to achieve highly wetted long-fiber reinforced thermoplastics. The technology at issue involves impregnating strands of fiber with thermoplastic resin. The strands, which are also known as rovings or rods, comprise thousands of filaments. Each filament is between 10 and 25 microns in diameter, barely visible to the naked eye.

The strand is drawn through a "pultrusion chamber" which contains melted plastic resin. To work the resin into the filaments, the strand is pulled over spreader surfaces. When pulled through the pultrusion chamber in such a fashion, the resin is forced into the strand, and the resin "wets" the filaments. The more resin that surrounds the filaments, the more thoroughly "wetted" the filaments become, and the greater the stiffness exhibited by the resulting plastics.

Once the wetted strand emerges from the pultrusion chamber, it is chopped into pellets. The pellets claimed by the inventors range in length from 2 mm to 100 mm. The pellets are subjected to a melt homogenization process, wherein they are heated, melted, and mixed. The melted plastic is then injected into molds.

### 2. How is "wetting" measured?

The patents at issue claim plastics products wherein the filaments are highly wetted. The question of how to determine whether filaments are sufficiently wetted forms the basis of one of the primary disputes of this case. There are a number of techniques, direct and indirect, to determine the degree of wetting of reinforcement filaments.

#### a. direct method: visual inspection

A direct method of measuring wetting is to cut a pellet with a knife and to examine the sliced pellet visually. A microscope can be used to inspect the pellet. The more thoroughly wetted the fibers, the fewer loose, unwetted fibers that will be visible. Under a microscope, it can be determined whether polymer surrounds the individual filaments. An advantage to this technique is that it provides a direct, visible measure of how thoroughly wetted the individual fibers are. A disadvantage is that there is some subjectivity in how the fibers are viewed and in how the wetting is evaluated. Moreover, visual inspections are relatively cumbersome to perform.

### b. indirect method: flexural modulus test

An indirect method for assessing the degree of wettedness is to measure the "flexural modulus" of a molded product. The flexural modulus test is a more convenient way of measuring stiffness than a truly scientific measurement, and can be readily performed in the laboratory. Once the pelletized polymer is melted, injected into a mold, and hardened, the resulting product can be subjected to a flexural modulus test.

There is a standard protocol recognized by the industry, labeled ASTM D790–80, that stipulates how to perform the analysis. The test requires the use of a standard rectangular bar of the specimen LFRT. The specimen bar is bent, and the amount of force necessary to flex the bar is recorded. There is a direct correspondence between the flexural modulus of a specimen and the degree of wetting of the reinforcement fibers therein. Flexural modulus measurements are expressed as a percentage. The measured flexural modulus is divided by a theoretical stiffness that would be obtained if the fibers of the specimen bar were 100% wetted. Specimens, for example, may be characterized as exhibiting 90% of the theoretically attainable flexural modulus.

The flexural modulus test has a disadvantage. Because the test requires that a strand be chopped into pellets and then injection molded into a specimen bar, the filaments are shorter than they are in the strand. Also, the fibers are not aligned in the same direction, as they are in the unchopped strand. As such, the specimen bar will be weaker than the unchopped, wetted strand, and the flexural modulus as measured by the standard ASTM D790–80 protocol will be significantly lower.

### c. indirect method: dispersal/length test

A second indirect method of determining the degree of wettedness of the fibers is to examine the dispersal of the individual filaments and the distribution of the lengths of the filaments in molded articles. The court will refer to this method as the dispersal/length test. The first aspect of this test involves an analysis of the spatial distribution of filaments in a product that has been injection molded from LFRT pellets. When each filament is individually wetted in the pellet, the filaments purportedly do not clump during the melt homogenization process, and the filaments will be randomly dispersed when the plastic is molded into a product. To examine the distribution of fibers in a molded product, the product is cooked in an oven such that the polymer component of the LFRT is "ashed," leaving behind the reinforcement filaments. The filaments can be visually inspected to determine whether they have been randomly dispersed throughout the product. If a rectangular bar is used as a specimen for the ashing test, the fibers will have a slight bias to orient themselves along the length of the bar. Aside from this bias, however, filaments that were completely wetted in the pellets should be randomly dispersed throughout the bar.

A second aspect of the dispersal/length test requires an analysis of the length of the filaments in a product that has been injection molded from the LFRT pellets. This aspect of the test derives from an allegedly surprising discovery of Cogswell and his colleagues. Cogswell testified that long-fiber reinforced plastics had commonly been found to work poorly in injection molding processes. Injection molding involves forcing melted, mixed plastics through a small hole—often approximately 2 mm wide. Cogswell testified that when long filaments that have been poorly wetted are forced through the channels of an injection molding apparatus, the bundles of filaments scratch the machine and the filaments break into shorter pieces. According to his testimony, thorough wetting of the filaments solves these problems. By surrounding the filaments with polymer, the filaments supposedly become lubricated, which allows them to pass through the injection molding apparatus without scratching the machine and without breaking. Under this theory, the degree of wettedness of reinforcement filaments can be determined by analyzing the length of the

filaments in a product that has been injection molded from LFRT pellets.

To determine the length of the fibers in molded products, a molded specimen is cooked in an oven, which "ashes," or removes, the polymer. A filament skeleton remains. With the aid of a computer, the fibers can be counted, measured, and sorted. The computer may sort the filaments by length, for example, separating all filaments with a length of 2 mm or greater. When the plastics claimed in the present invention are molded into a specimen, they are characterized as having at least 50% by weight of the filaments retaining a length of greater than 2 mm, or having a "weight-average length" of at least 2 mm.

### C. *The Patents*

LNP and Kawasaki have asserted claims of three patents against RTP. All three patents relate to the same technology and contain the same specification. The '262 patent claims a fiber strand that is wetted with polymer; the '450 patent, as reexamined, claims pellets chopped from the wetted fiber strand; and the '889 patent, as reexamined, claims a molded article formed from the reinforced thermoplastic. Following are the patent claims relevant to the present dispute:

1. *Claim 1 of the '262 patent*

A thermoformable, fibre reinforced structure comprising a thermoplastic polymer and at least 30% by volume of parallel aligned reinforcing filaments having a diameter of up to 24 microns said filaments having been wetted by the said polymer in a continuous melt protrusion process so as to give a longitudinal flexural modulus determined by ASTM D790–80 of at least 70% of the theoretical attainable flexural modulus.

2. *Claim 3 of the '262 patent*

A thermoformable fibre reinforced structure comprising a thermoplastic polymer and at least 30% by volume of parallel, aligned reinforcing filaments having a diameter up to 24 microns said filaments being substantially completely wetted by thermoplastic polymer charac-terized in that when the structure is chopped into moulding pellets between 2 mm and 100 mm in length and formed into a shaped article by a process which includes the step of subjecting the pellets to a melt homogenisation process to produce a random distribution of individual filaments in molten polymer, the fibre length is retained to the extent that at least 50% by weight of the filaments are at least 2 mm long.

3. *Claim 1 of the '450 Patent, as Reexamined*

Pellets of reinforced thermoplastic material containing at least 30% by volume of parallel, aligned reinforcing filaments between 2 and 100 mm in length, the filaments extending through the length of the pellets, the pellets having been cut from a continuous reinforced product prepared by melt protrusion in which the filaments have been substantially completely wetted by a molten thermoplastic material, and which pellets can be injection molded into an article in which the filaments are present in the form of randomly dispersed individual filaments at least 50% by weight of the filaments of the pellets retaining a length of greater than 2 mm in the molded article.

4. *Claim 6 of the '450 Patent, as Reexamined*

Pellets according to claim 1 which have been cut from a continuous reinforced product in which the individual filaments of the product have been wetted to the extent that the longitudinal flexural modulus of the product as determined by ASTM D790–80 is at least 70% of the theoretically attainable flexural modulus.

5. *Claim 1 of the '889 Patent, as Reexamined*

A molded article formed from a fibre reinforced thermoplastic composition in a process which includes the step of melting and homogenizing a composition containing at least 30% by weight of fibre reinforced pellets between 2 mm

and 100 mm long which pellets have filaments extending the length of the pellet, characterized in that the molded article contains reinforcing filaments in the form of individual filaments and at least 50% by weight of the filaments in the pellets being present in the molded article at a length of greater than 2 mm, the pellets having been cut from a structure of continuous, parallel, aligned, reinforcing filaments which have been substantially completely wetted by a molten thermoplastic in a melt pultrusion process.

There are a few important distinctions to be made among the above claims. First, three of the claims—claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined— describe the fibers as being "substantially completely wetted." These three claims, in order to provide a measure for the term "substantially completely wetted," recite the dispersal/length test. Claim 1 of the '262 patent does not recite the term "substantially completely wetted," and recites the flexural modulus test as the measure for determining the degree of wettedness of the reinforcement fibers. Claim 6 of the '450 patent, being dependent on claim 1, necessarily incorporates the dispersal/length test as the measure of wettedness, but also specifies the flexural modulus test as a further limitation.

The three patents at issue share a common specification. The flexural modulus test is mentioned repeatedly therein. The specification states that "[t]he efficiency of a particular process in wetting the fibres ... may be assessed by measuring the extent to which the process provides a product having a flexural modulus approaching the theoretically attainable flexural modulus."

### D. The Lawsuit

On September 16, 1996, LNP filed a complaint alleging that RTP infringes unspecified claims of the '262 patent, the '450 patent, and the '889 patent. LNP amended its complaint on December 6, 1996, adding Kawasaki as a party plaintiff. On January 28, 1998, RTP filed its answer and counterclaim. RTP asserted that it was not subject to personal jurisdiction in this court, that venue in this court is improper, and that LNP lacks standing to sue under the asserted patents. RTP further contended that it does not infringe any of the patents at issue, that the claims are invalid under §§ 101, 102, 103 and/or 112 of the Patent Act, that LNP's patented products were inadequately marked, that the suit is barred by laches, that RTP's reliance on LNP's actions and inactions estop plaintiffs from bringing suit, and that RTP has acquired intervening rights under 35 U.S.C. § 307. RTP also counterclaimed that the claims are invalid, unenforceable, and not infringed for all the reasons set forth in its affirmative defenses. In its prayer for relief, RTP requested that plaintiffs' complaint be dismissed with prejudice, that LNP's counter-defenses be denied and judgment entered for RTP, that the court enter a declaratory judgment that the claims at issue are invalid and unenforceable, that the court enter a declaratory judgment that the claims at issue have not been infringed by RTP, and that the court declare that this case is exceptional and warrants an award of costs and fees.

The case was originally assigned to Judge Joseph J. Longobardi. Upon the retirement of Judge Longobardi, the case was reassigned to Judge Roderick R. McKelvie on June 25, 1997.

In response to the various jurisdictional challenges brought by RTP, the court issued a Memorandum Opinion on December 22, 1997. The court ruled that LNP's rights as a licensee were sufficient to confer standing. The court also asserted personal jurisdiction over RTP and declined to transfer venue to Minnesota.

On January 22, 1998, LNP filed a second amended complaint. The complaint stated that the PTO had reexamined the '450 patent and the '889 patent, and that reexamination certificates had issued on October 29, 1996. The complaint asserted that

the reexamination proceedings did not change the legal scope of those patents.

The expert reports submitted by the parties during discovery identified only three claims as being at issue in this case. The expert report of R. Byron Pipes, submitted on behalf of plaintiffs, and the report of Lawrence J. Broutman, submitted on behalf of defendant, both state that the scope of testimony sought to be provided by the experts would relate to claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined. Similarly, LNP's discovery responses and contention interrogatories allegedly did not provide notice that LNP would assert other than these three claims. In the Joint Pre–Trial Order filed on September 1, 1998, LNP identified two additional claims—claim 1 of the '262 patent and claim 6 of the '450 patent, as reexamined—as being infringed by RTP. The stated reason for this belated assertion is that the declaration of Mr. Ralph Scott Charbonneau, as submitted by RTP on August 7, 1998, provided grounds for finding infringement of the two previously unasserted claims. The court allowed the parties to present evidence at trial relating to all five of the claims.

On September 3, 1998, RTP filed a motion to amend its answer and counterclaim to allege the defense of inequitable conduct. RTP allegedly was not able to discover evidence necessary to its inequitable conduct defense because the documents were held by the original patentee, ICI, a British company, and because counsel for LNP purportedly could not procure these documents. At the pre-trial conference on the same day, the court granted the motion. The court stated that the issue of inequitable conduct would not be submitted to the jury, but that evidence relating

to the issue could be presented to the court at another time.

On September 8, 1998, the court granted RTP's request for international judicial assistance pursuant to the Hague Convention to compel discovery of the documents.[1] On September 15, 1998, the Queen's Bench Division of the High Court of Justice of England and Wales issued a summons, and discovery proceeded.

On November 6, 1998, the court held a final pre-trial conference during which the court permitted RTP to supplement the pretrial order to add a best mode defense. In justifying this belated assertion of the best mode defense, RTP contended that it did not receive the notebooks of the British inventors until discovery had proceeded pursuant to the Hague Convention. Once the notebooks were produced, material therein purportedly provided RTP with grounds to support its best mode defense. RTP sought to present the best mode defense to the jury with the remainder of the issues. Rather than postpone the trial to permit the presentation of evidence to the jury on the best mode defense, the court invoked Rule 16 to bar litigation of the issue in front of the jury, as the defense had not been raised in the pre-trial order.[2] The court stated that it would hold a hearing after the close of the jury trial to resolve issues relating to the inequitable conduct and best mode defenses.

### E. *Claim Construction*

The court conducted a *Markman* hearing on September 15, 1998. On November 5, 1998, the court issued its *Markman* opinion. The parties had disputed the meaning of four claim terms: 1) "pultrusion;" 2) "thermoformable;" 3) "substan-

---

1. The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, to which the United States has acceded, prescribes certain procedures by which a judicial authority in one contracting state may request evidence located in another contracting state. 23 U.S.T. 2555, T.I.A.S. No. 7444, 28 U.S.C. 1781.

2. Rule 16(c)(1) of the Federal Rules of Civil Procedure authorizes trial courts to conduct pre-trial conferences to take appropriate action with respect to "the formulation and simplification of the issues, including the elimination of frivolous claims or defenses."

tially completely wetted;" and 4) "a composition containing at least 30% by weight of fibre reinforced pellets." Because RTP has challenged the court's construction of the term "substantially completely wetted" in its post-trial motions, the court will briefly review its findings regarding this limitation as presented in its *Markman* opinion.

During claim construction, the parties contested the meaning of the claim term "substantially completely wetted." LNP sought a claim construction that reflected the literal wording of the claims, and that did not refer to the flexural modulus test. LNP's proposed construction, which was largely adopted by the court, stated that "substantially completely wetted" meant that the filaments be "largely, but not necessarily wholly, surrounded by resin." As a measure to quantify the degree of wetting, LNP's proposed construction, as is recited in the claim language, recites use of the dispersal/length test.

RTP, on the other hand, sought to construe the term "substantially completely wetted" in reference to the flexural modulus test. RTP noted that the specification and the prosecution history of the patents in suit used the flexural modulus test to characterize the claimed plastics, and to distinguish them from products in the prior art. As such, RTP advocated incorporating language from the specification into the construction of the claims, and asserted that "substantially completely wetted" means "the product must attain at least 90% of the theoretically attainable flexural modulus."

The court rejected RTP's proposed construction. The court reasoned that the flexural modulus test was only an indirect test that did not directly measure the characteristics of the claimed wetted strand and pellets. Moreover, the court found that the prosecution history of the patents did not compel a finding that the term "substantially completely wetted" is tied to the flexural modulus test. Thus, the court concluded that the term "substantially completely wetted" should be defined in terms of the dispersal/length test, as follows:

Largely, but not necessarily wholly, surrounded by resin. In the context of LFRT pellets, it is surrounding the individual filaments by resin to the extent that in articles injection molded from such pellets, the individual filaments are randomly dispersed and at least 50% by weight of the filaments retain a length of 2 millimeters or greater.

*LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.,* No. 96–462 (D.Del. Nov. 5, 1998) (claim construction opinion).

### F. *The Trial*

The case was tried to a jury for nine days beginning on November 12, 1998.

#### 1. *LNP's opening statement*

Thomas Kenworthy delivered the opening statement on behalf of LNP. He explained the genesis of the claimed inventions and introduced the patents at issue to the jury. Kenworthy focused on claim 3 of the '262 patent, and explained that the limitation "substantially completely wetted" would be met if the individual filaments in a product injected molded from the plastic pellets were randomly dispersed, and if the length of the filaments was retained in the molded product such that at least 50% by weight of the filaments were at least 2 mm in length.

Kenworthy told the jury that the evidence would show that LNP's Verton product, which embodies the claims at issue, became a successful product. RTP, he continued, sought to gain entry into the LFRT market, and conducted a patent search. Upon learning of the '262 and '450 patents, RTP allegedly gave no indication that the patents did not read upon their products; rather, RTP purportedly believed that it was free to produce LFRTs, as it was merely practicing the prior art.

#### 2. *RTP's opening statement*

Ray Lupo delivered the opening statement on behalf of RTP. He explained to the jury the nature of the plastics that RTP manufactures. He indicated that the

evidence would show that the technology relied upon by RTP derives from devices invented by Ron Hawley, and that Hawley had granted RTP a license to develop this technology. This technology, Lupo emphasized, was developed in 1979 and patented in 1982, years before the issuance of the patents at issue in this litigation. Lupo stated that Hawley worked for a company, Fiberite, that acquired rights in Hawley's technology, and that later spun off the firm of RTP. The evidence would show, Lupo continued, that when RTP sought to produce LFRTs, it built an apparatus according to Hawley's teachings. The products obtained from this process, Lupo explained, typically exhibited less than 70% of the theoretically attainable flexural modulus, and had less than 30% by volume of fibers. Given these physical characteristics and the fact that RTP was merely practicing the Hawley art, Lupo told the jury that the evidence would not permit a finding of infringement.

Lupo emphasized that the evidence would show that the patents at issue are invalid. He explained that Hattori and Bradt, two inventors, had worked together at Fiberfil Company for many years and had patented numerous developments on thermoplastics. Lupo explained that when Kawasaki had previously attempted to assert its patents against companies, the Hattori patent was raised as a prior art reference that potentially invalidated Kawasaki's patents. In response, Kawasaki submitted the '450 and '889 patents to the PTO for reexamination, reconstructed the Hattori apparatus, and convinced the examiner that the Hattori method produced plastic inferior to Kawasaki's claimed technology. Lupo said that the evidence would show that Kawasaki improperly recreated the Hattori process, misleading the examiner to believe that Kawasaki's technology was distinct and superior.

Lupo told the jury that the evidence would show that willful infringement is inapplicable because RTP obtained an opinion stating that RTP was merely practicing the prior art, and that it was permissible to continue doing so.

### 3. Robert E. Schultz

LNP called Robert E. Schultz, who was then serving as President and CEO of Kawasaki LNP, the holding company to which LNP reports. Schultz testified that LNP has rights as a licensee to the patents at issue. Schultz discussed the history of LNP, and described that RTP is one of LNP's three principal competitors. When the patents at issue emerged from reexamination proceedings, Schultz continued, LNP sued all three of these competitors. Schultz concluded his testimony with financial data of LNP.

### 4. Frederic Neil Cogswell

LNP next called Frederic Neil Cogswell. Cogswell is a native Englishman who began working at ICI in 1959 as a laboratory assistant, and who rose through the ranks as an experimental chemist in ICI's Plastics Division, eventually becoming a technical officer of the company. Cogswell is currently an adjunct professor at the University of Delaware, and lectures at other universities as well. He told the jury about the physical properties of plastics. He testified that the prior art at the time of his invention taught that long-fiber reinforced thermoplastics could not be made, and that if they were made, they would be undesirably brittle. The widespread understanding in the industry, he indicated, was that the long fibers would scratch injection molding machines, and break. Using a pultrusion technique, Cogswell said that he came to the surprising result that by thoroughly wetting the filaments of a fiber strand, the individual filaments would become sufficiently lubricated by the polymer that they would pass freely through an injection molding apparatus, remaining intact. The resulting products, he described, had surprisingly excellent properties that were found desirable in applications such as manhole covers, propeller blades, and snowshovel handles. He testified that the molded products, when burnt in an oven, leave behind a skeleton of randomly distributed fibers. He testified

that the product's commercial name, Verton, derives from this vertebrate structure. He displayed for the jury the skeletal remainder of a pellet that had been ashed in an oven.

On cross-examination, Cogswell acknowledged that the prior art had disclosed that improved wetting of reinforcement filaments can be achieved by spreading the filaments of the strand over a series of "spreader bars" in a pultrusion chamber. Cogswell also recognized that the flexural modulus test is a common, convenient method of determining the degree of wetting of the reinforcement filaments. Cogswell acknowledged that his co-inventors had experimented on how best to place spreader surfaces in the pultrusion chamber, and that none of the patents at issue contained drawings disclosing these spreader bar systems.

### 5. *Hugh Miller*

LNP next called Hugh Miller, who at the time of trial was the Chief Executive Officer for RTP, and who had held that post since 1982, following his father and grandfather in their leadership of Miller Waste Mills. Miller acknowledged that an internal RTP memorandum relating to the development of RTP's own long-fiber production line stated that LNP's Verton product had achieved success through excellent physical properties and good marketing. Miller recognized that a letter written on February 12, 1992 by Peter McCamley, the Vice President of RTP, to McDermott, Will & Emery, recites that the Cogswell '450 patent "would fall in line" with products made by RTP. As acknowledged by Miller, this letter also states that RTP's wet-out process "is different in concept/design to the ICI patent and to the PCI/Celanese or AKZO patents."

Miller testified that in 1994 he had received a letter from William Schwarze, a patent attorney retained by LNP, and that the letter apprised RTP of the patents at issue in this case. Miller emphasized, however, that he believed RTP had the right to manufacture LFRTs according to the Hawley process. Miller acknowledged that he had no knowledge of any effort to get an opinion from McDermott, Will & Emery before April 1994. Miller testified that when that opinion was received on November 4, 1994, he never read the opinion letter, but understood through discussions with counsel that RTP had the authority to make LFRTs. The opinion letter suggested that RTP analyze its products to determine which ones had less than 30% by volume of parallel aligned reinforcing filaments, as is claimed in the '450 patent. Miller testified that since he is not a lawyer, he would not understand the letter, and did not read it.

Miller testified that in September 1995 he received a letter from Dr. George Niznik, Vice President of LNP, which invited RTP to participate in the reexamination of the '450 and '889 patents. Miller stated that he had no knowledge as to whether RTP participated in these proceedings.

On cross-examination, Miller reviewed the opinion letter from McDermott, Will & Emery and testified that the letter stated that the '450 and '889 patents are invalid.

### 6. *Thomas Markey*

LNP next called Thomas Markey, Vice President of Business Management for RTP. Markey testified that RTP was planning to "toll manufacture" LFRTs for DuPont, whereby DuPont would provide the raw materials, and RTP would produce reinforced plastic pellets for DuPont. He stated that during negotiations with DuPont in 1991, DuPont inquired into RTP's situation with respect to patents in this area of technology. Markey acknowledged that during a series of correspondences between RTP and McDermott, Will & Emery, Peter McCamley, Vice President of RTP, wrote to the law firm and stated that the claims of the '450 patent "would fall in line" with products made by PCI Celanese, Wilson Fiberfil, and RTP. Markey did not recall what he did with this letter, but presumably "just filed it." Markey testified

that RTP's sales of LFRTs increased annually from 1992 through 1997.

Markey testified that he had requested that McDermott, Will & Emery prepare an opinion regarding RTP's potential liability under all three patents in suit and one non-asserted patent (U.S. Patent No. 4,549,920, or the '920 patent). The opinion was issued in September 1994. Markey acknowledged that the non-infringement section of the opinion only deals with the '920 patent and the '262 patent, and that the opinion letter does not state that RTP does not infringe the '450 and '889 patents. The letter, as noted by Markey, stated that all four patents being considered were invalid in view of the prior art.

Markey then reviewed a document entitled "RTP Company VLF Program," which was issued on November 12, 1991. This document states its objective as illustrating the status of RTP's LFRT product line. The document, as acknowledged by Markey, states that LNP has done an excellent job marketing their Verton product line, and that the Verton products have excellent physical properties. RTP, the document continues, "has been almost exclusively replacing Verton product." Markey declined to offer a contrary opinion.

On cross-examination, Markey explained that most of the growth in sales of RTP's long fiber products is attributed to products having less than 30% by volume fiber reinforcement.

On redirect, Markey testified that when the present lawsuit was filed, he issued a guideline to RTP personnel indicating that they should only sell long fiber products with less than 30% fiber, by volume.

### 7. George E. Niznik

LNP next called George E. Niznik, Vice President and Director or Research and Development at LNP. Niznik testified that LNP began analyzing the products of its competitors in 1994, when LNP became aware of a customer that was using RTP materials. According to Niznik, LNP conducted a major project to determine which, if any, of the competitors' products infringed the patents at issue. The testing has an eight-step methodology, directing the analysts to: (1) examine pellets for "parallel and aligned" glass fibers with filament diameters of less than 24 microns; (2) extract thermoplastic from pellets and fiber; (3) burn-out pellets for volume % glass determination; (4) compression mold pellets to determine probability that the pultruded rods were greater than 70% of theoretical modulus; (5) determine that filaments of glass are for the most part completely wetted; (6) mold competitive samples side by side with comparable VERTON product; (7) conduct burn-out and document that filaments are randomly dispersed; (8) measure filament size in molded article to verify that 50% by weight of the glass is greater than 2mm in length. The testing was supervised by Dale Grove, and later by Lee Glen, and performed by Daria Miller. Niznik testified that one sample of RTP product, RTP type 84009, was analyzed in 1994. This sample yielded 30.229% glass by volume. LNP acquired specimens of a second RTP product, designated No. 68903B, in 1996. This product yielded 30.0285% glass by volume.

Niznik testified that a number of letters were exchanged between Schwarze, patent counsel for LNP, and Duncan, patent counsel for RTP. Niznik stated that Duncan, at no time in the letters, made any statement to the effect that RTP did not infringe the patents in suit. According to Niznik, Duncan's writings targeted the potential invalidity of the patents, particularly in light of the Hawley and Bradt patents. Niznik said that, in response to the allegations of invalidity, LNP submitted the '450 and '889 patents to the PTO for reexamination. Niznik stated that he invited Miller, the CEO of RTP, to participate in the reexamination proceedings, but that Miller did not do so. When LNP received notification from the PTO that the reexamination certificates were going to issue, Niznik continued, LNP sued RTP and two other parties, PCI and DSM.

On cross-examination, Niznik conceded that he received a document dated March 5, 1990, from Dale Grove, that had concluded that RTP's products do not infringe the patents at issue. The document recites that "RTP is not infringing ICI patents because they produce a 16% fiber volume (26% by weight) product that must employ a means of impregnation similar to PCI's approach." The document further states that the RTP pellets yielded a filament dispersion pattern similar to that found in the PCI process created by Hawley. Niznik admitted that Grove did not discuss this testing with him when the 1994 testing project began. Niznik also conceded that the pen-knife test is subjective, and that experts can disagree on whether a pellet is substantially completely wetted when the pen-knife test is employed. And, Niznik admitted that LNP had only tested two of RTP's products to determine if they infringe the patents at issue.

On redirect examination, Niznik noted that the testing performed by Grove in 1990 was conducted on pellets containing carbon fiber, not glass fiber. Niznik also pointed out that the testing was performed in 1990, prior to the issuance of the '450 or '889 patents. And, Niznik stated that the language in the specification discussing the flexural modulus test is irrelevant for determining infringement of three of the claims at issue—claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined—because these claims had been defined by the court in terms of the dispersal/length test.

### 8. Peter J. McCamley

LNP next called Peter J. McCamley. At the time of trial, McCamley was the Vice President of Research and Development for RTP. He conceded that "the whole advantage" of the long fiber pellets is their ability to retain their fiber length in the injection-molded article, and that RTP had limited technological capacity for producing LFRTs in 1990. McCamley was shown an internal document that he had written in 1991, in which he disclosed data on LNP's Verton "6/6" compounds, and in which he wrote that "I am confident we can produce ⅝ nylon VLF glass fiber materials similar to what is available currently." McCamley testified that in 1992 RTP had one LFRT production line in operation, and that it had identified numerous large prospective customers that would potentially buy LFRT products in 1993. McCamley also acknowledged that an internal RTP document (PX 158) listed various RTP polymers, with the correlation between weight percentage of fiber and volume percentage. He stated, moreover, that all the fibers used in RTP LFRT products have a diameter of less than 24 microns.

### 9. R. Byron Pipes

LNP next called R. Byron Pipes. Pipes, at the time of trial, was the President of Rennslaer Polytechnic Institute, having had extensive background in polymer science. Pipes gave his opinion that a number of RTP products infringe three of the claims at issue: claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined. Pipes stated that he had six grounds for his opinion. First, Pipes testified that he had visually inspected the pellets, having cut them open and found no loose unwetted fibers which would be typical of poorly wetted materials. He stated that he then had examined the pellets under a microscope, which substantiated his earlier observations. He then testified that he had inspected injection-molded articles, like a manhole cover, looking for aggregations of fibers, and had seen a uniform distribution of fibers on the surface of the article, which he stated is indicative of well-distributed fibers under the surface.

Second, Pipes stated that he had examined specimen bars which had been ashed, and that the fibers retained a vertebrate structure, and that the fibers were intermeshed with one another.

Third, Pipes testified that he visited the RTP production site. He played a video for

the jury, which showed a continuous fiber structure being introduced into the polymer impregnation chamber and then chopped into pellets.

Fourth, Pipes reviewed a number of RTP documents describing the properties of their LFRT products. One such document listed a number of RTP products, with the percent glass fiber, by weight. Pipes testified that these weight percentages could be readily converted to volume percentages. Pipes agreed with McCamley's testimony that all but two of the products having 50% by weight of fiber or greater have a volume fraction of at least 30% fiber.

Fifth, Pipes stated that McCamley's deposition testimony provided a basis for his infringement opinion. McCamley therein admitted that in the injection molding of RTP's LFRT pellets, the individual filaments are randomly dispersed. The pellets, McCamley had testified, had fiber lengths greater than 2 mm for up to 50% of the fiber by weight, and this fiber length is retained, McCamley had stated, in the molded product. Pipes recounted McCamley's deposition testimony, in which McCamley agreed that RTP's internal documents directed to its marketing personnel stated that "RTP Company completely wets out individual glass fibers and pellets."

Sixth, Pipes testified that he had reviewed the laboratory notebooks and the testing performed by RTP scientists and engineers, and that these sources corroborated his own findings. He also testified that he read the legal opinions of Duncan, and that Duncan had not therein stated that the RTP LFRT pellets containing greater than 30% by volume did not infringe claim 1 of the '450 patent; and that she had not therein written that injection-molded articles made from RTP LFRT pellets did not infringe claim 1 of the '889 patent.

On cross examination, Pipes admitted that, with respect to the video that he had shown to the jury, he had not seen inside the impregnation chamber used by RTP in wetting its fibers. Pipes conceded that his opinion does not inform whether RTP infringes claim 1 of the '262 patent. He admitted that he was not present when Daria Miller had performed testing for LNP on RTP's accused products, and that some of the test procedures she had used are subjective in nature. He refuted, however, Lupo's suggestion that the average weight length determination tests performed by Miller are subjective.

### 10. *Ralph Scott Charbonneau*

LNP next published a declaration of Ralph Scott Charbonneau, who at the time of the trial was Technical Coordinator for RTP's Western Region. Charbonneau therein recited the flexural modulus properties of various RTP products.

### 11. *Richard J. Burns*

LNP next called Richard J. Burns, who at the time of the trial was the President of LNP Engineering Plastics, Inc. He testified that, in 1992, LNP was not interested in licensing its technology to RTP, but rather that LNP's intention was to exploit its patent position. RTP, he testified, was LNP's chief competitor across all LNP's other product lines. Burns' testimony concluded LNP's case-in-chief.

### 12. *Frederic N. Cogswell*
#### a. *direct examination*

As its first witness, RTP called Frederic N. Cogswell, who had previously been called by LNP, and who is an inventor of the patents at issue. Lupo began by questioning Cogswell as to his belief that he was the first to achieve substantially complete wetting of long reinforcement fibers in a melt protrusion process. Lupo questioned Cogswell on U.S. Patent No. 2,877,501, issued to Rexford Bradt ("Bradt '501 patent"), which was assigned to Fiberfil, and which claims technology relating to emulsion impregnation of fibers to produce reinforced plastics. The specification of the Bradt '501 patent recites opening up a glass strand before the polymer is applied

thereto "so that each filament in the granule may be uniformly coated." Cogswell acknowledged that this language could be interpreted to disclose the technology at issue, but stated that Bradt never disclosed how to perform this impregnation. Rather, Cogswell stated, the specification can be interpreted as disclosing the method of production that Fiberfil actually employed, which was to coat the entire strand with polymer without wetting the individual filaments.

Lupo next questioned Cogswell on U.S. Patent No. 3,042,570, also issued to Bradt and assigned to Fiberfil ("the Bradt '570 patent"). Cogswell acknowledged that the patent specification recites that it may be desirable "to work or flex the [glass] strands as they pass through the molten resin in the coating chamber in order to vary the extent to which such resin penetrates the strand," but Cogswell refused to agree that this language teaches that each individual filament of the strand becomes substantially completely wetted thereby. This language, Cogswell said, states that it is possible to flex the fibers, without giving an indication of how to do so.

Cogswell next commented on the reexamination proceedings for the '450 and '889 patents, in which the examiner initially rejected the claims based in part on UK Patent No. 1,167,849, issued to Kiyoshi Hattori et al. Cogswell noted that the Hattori patent recites that, in order to chop pellets from a wetted strand, the strand must first be heated. Otherwise, Cogswell stated, the polymer would shatter, leaving a "mass of fiberglass," because the individual filaments had not been wetted. Cogswell testified that he participated in replicating the Hattori process for the aid of the patent examiner, and that he tried to faithfully reproduce the process as taught in the '849 patent. Cogswell acknowledged that the replicated device did not comprise spreader bars, which were disclosed in the Bradt '570 patent and incorporated into the Hattori '849 patent by reference. Cogswell testified, however, that he believed that Hattori's preferred embodiment, as disclosed in Figure 2 of the Hattori patent, did not employ such spreader bars. Cogswell also acknowledged that the replicated device was run at a speed of 30 meters per minute, whereas Fiberfil had operated its production line at a speed of 3 meters per minute. This difference, Cogswell testified, is due to the difference in polymers employed. He stated that for polypropylene, which LNP used in the replicated process, a faster speed is appropriate due to the polymer's low viscosity.

Lupo next questioned Cogswell on U.S. Patent Nos. 4,439,387 and 4,312,917, both issued to Ronald C. Hawley ("the Hawley patents"). Cogswell acknowledged that he had assumed the products produced by PCI embodied the Hawley patents. He also acknowledged that he had represented to Mr. Scott (who was the attorney representing LNP in the reexamination process) that the Verton products are distinct from the products made by Hawley because Hawley's products only exhibited 70% of the theoretically attainable flexural modulus, whereas the Verton products attained a level of 90%.

Lupo questioned Cogswell on the notebooks of his co-inventor, Peter J. Williams. Williams' notebook states that "[i]t was also found that the lace path through the melt was crucial in that one lacing up pattern was superior to another, giving rise to an indication of the extra wetting achieved in conjunction with the number of spreader bars engaged," which Cogswell paraphrased as stating that a greater number of spreader bars yields improved wetting. Cogswell acknowledged that no drawing in the patent illustrated this concept, and that no spreader bars were illustrated.

Lastly, Cogswell addressed the language of claim 1 of the '889 patent, which recites the "30% by weight of fiber reinforced pellets" limitation. Cogswell acknowledged that the preamble of the patent recites that the technology relates to thermoplastic structures containing "at least 30% by

volume of reinforcing filaments." He recognized that the words "30% by weight of pellets" are not recited in the patent specification.

Lupo introduced into evidence an internal ICI document written by Dale Grove in 1990 that describes three patents—U.S. Patent .Nos. 4,541,884; 4,559,262; and 4,549,920—owned by ICI and that states that the pellets claimed therein:

contain at least 30% by volume (not weight) fibers. There has been a recent attempt to amend this claim to read 30% by weight fibers, but until this new amendment is in effect (if it ever is) the law currently stands at this volume percentage. Thirty percent by volume fibers corresponds to roughly 50% by weight fiber in the RF series.

Cogswell stated that he was not aware of this prior attempt to change the language of the claims, as he was in ill health at the time.

Lupo presented deposition testimony of Hezzell, who stated that he interpreted the claim to mean that the composition "contains at least 30% by weight of fiber." Hezzell also stated therein that "I don't understand the concept of a percent by weight of pellets."

Lupo then presented a 1991 letter by J.M. Downer, an attorney in ICI's patent department, that was addressed to the European Patent Office. This letter relates to the European counterpart of the '889 patent. The letter attempts to correct an error that Downer discovered in the application. The letter states:

An error has been noticed in claim 9 (now claim 8) in that the requirement should be that the composition contains "at least 30% by weight of fibres in the form of reinforced thermoplastics pellets", rather than "at least 30% by weight of ....... pellets".

Cogswell declined to speculate as to what Downer intended by this language.

### b. cross-examination

On cross-examination, Cogswell first addressed LNP's efforts to replicate the Hattori process for the PTO reexamination proceedings. He stated that it was LNP's goal to replicate the Hattori process, not the Bradt process that is referenced in the Hattori patent.

Kenworthy next directed Cogswell's attention to claim 1 of the '889 patent. Cogswell testified that Example 28 in the specification gives support to the "30% by weight" claim limitation.

### c. redirect examination

On redirect examination, Cogswell acknowledged that the process he replicated for the PTO during reexamination was based in part on the Bradt '570 patent.

### 13. Richard J. Burns

LNP next called Richard J. Burns to complete his earlier testimony. Burns testified that, in an October 1992 negotiation between LNP and RTP, there was discussion about potentially granting RTP a license. Burns testified that LNP would have regarded the license as an incremental sale, allowing RTP to cover their costs, and allowing RTP a 10% margin. LNP would expect the rest of the margin, Burns testified, as a reasonable royalty.

On cross-examination, Burns contested the suggestion that there was a discrepancy between his formulation of the damages, and that of Niznik, who was deposed on behalf of LNP during discovery.

### 14. George E. Niznik

RTP next called George E. Niznik, who had previously testified for LNP. Regarding the replication of the Hattori device for the reexamination proceeding at the PTO, Niznik testified that LNP based the replication on Example 2 of the Hattori patent. Niznik acknowledged that a number of figures in the Hattori patent illustrate the use of bars, but that LNP chose not to include bars in their replica. Niznik also acknowledged that the replica used a relatively fast rate of pultrusion, and that the rate of pultrusion does have an effect on the efficiency of the wetting process, par-

ticularly when spreader bars are employed.

On cross-examination, Niznik stated that, when replicating the Hattori device in accordance with Example 2 of the patent, it would be improper to build the device in light of the teachings of the Bradt '570 patent, as Example 2 contains no reference to the Bradt patent. He also stated that neither the Bradt patent nor the Hattori patent give an indication of the proper line speed to use in the replica. Niznik testified that, in arriving at a line speed of 30 meters per minute for the replica, LNP looked to the prior art, and Japanese reference 52–112653, in particular.

### 15. Ronald C. Hawley

RTP next called Ronald C. Hawley, who had served as Director of Technical Service for Fiberite Corporation in Minnesota, and who had invented the technology claimed by U.S. Patent Nos. 4,439,387 and 4,312,917. He testified that he left employment at Fiberite in September of October of 1981 to help start a new company, Polymer Composites, Inc. ("PCI"). He stated that during a particularly heavy snowstorm in January 1979, while still working for Fiberite, his wife had asked him if he couldn't design a better, stronger plastic snowshovel. He conceived of the idea of designing the snowshovel handle from a thermoplastic pultrusion, in which he sought to coat the individual filaments of a strand of glass fibers with thermoplastic resin. Hawley testified that he contacted a local patent attorney, Malcolm Moore, about patenting the idea and to analyze the relevant prior art. Hawley testified that his employment with Fiberite posed a problem to his independent development of this technology, as he had previously entered into an agreement with Fiberite that inventions made by employees become the property of the company. Hawley stated that he met with William Laurie, who was then Vice President of Fiberite. Laurie agreed to allow Hawley to retain rights to the technology, and to assist Hawley in its development, in exchange for "shop rights" in the technology, whereby Fiberite would retain a royalty-free, nonexclusive right to practice the technology.

Hawley testified that he designed a prototype process whereby he could force thermoplastic resins into the center of a bundle of glass fiber, thereby coating each individual filament. He stated that his method comprises running the fiber strand over rods, which causes the strand to open up and expose filaments within the strand to the resin. Hawley showed the jury members samples of plastics resembling those produced by the prototype device.

Hawley testified that he and Moore filed a patent application on September 13, 1979, and that U.S. Patent No. 4,312,917 issued on January 26, 1982. He recited language from the patent, and stated that it discloses that the glass fiber material and resin would flow under one strand, one lobe, thereby flattening the fiber strand, exposing resins, and then flow over another and another lobe, in an effort to dry or cause resin to cover or coat each filament. Hawley stated that lobes, bars, or rods could be interchangeably used as spreader surfaces.

Hawley testified that he obtained incorporation status for PCI on October 29, 1980. He solicited working capital from friends and family, and moved into a new facility in Winona, Minnesota in November 1980. Hawley testified that he achieved his first product run in April 1981. He stated that the process could produce pultruded bars, rods comprised of several bars, and tapes, all trademarked under the name Fiberod. PCI was not allowed to produce pellets, pursuant to a two-year covenant-not-to-compete with Fiberite. He stated that PCI's products yielded a 65% by weight fiber content, which is approximately 40% fiber by volume.

Hawley testified that he provided engineering drawings to Fiberite in compliance with the shop right agreement, and that he gave Ben Miller, then-President of Fiberite, an opportunity to observe the equipment at PCI. Hawley stated that he spoke with Peter McCamley, and that he agreed

to supply McCamley with lengths of rods, so that McCamley could pelletize the rods and provide Hawley with test data. Hawley discussed the data sheet that PCI published in July or August of 1982. He stated that the glass content of one his products (PPGL–65) was greater than 30% by volume.

Hawley stated that PCI became a successful company, with a 1988 valuation of between 15 and 20 million dollars, when the company was sold to Hoechst Celanese.

#### a. *cross-examination*

On cross-examination, Hawley acknowledged that in his deposition testimony he had stated that Fiberfil products, in the early 1980s, were impregnated with resin on the outside of the glass pellets, but that the inside of the pellets was dry and void of resin.

Hawley reviewed the disclosure statement he and Fiberite signed in 1981, in which he identified twenty-three drawings that represented the "know how" of his invention. Hawley insisted that the enumerated materials did disclose the use of spreader surfaces, and that spreader bars were in place by the time representatives from Fiberite inspected the invention.

Hawley acknowledged that one embodiment of his invention was to produce reinforced plastic insert rods that could be put into injection-molded products to provide localized reinforcement, but he insisted that his invention was not limited to this embodiment, and that the rods he produced could be pelletized.

Hawley acknowledged that he had not reduced to practice all the inventions he had conceived for achieving a complete wet-out of filaments. A PCI business plan, dated November 20, 1981, recites that PCI had difficulty in achieving a complete wet-out within the Fiberod products. Hawley recognized that the business plan stated that there were many variables within the control of PCI, and that PCI had to find the right combination of these parameters to achieve an optimal wet-out.

#### 16. *June Hawley*

RTP next called June Hawley, wife of Ronald Hawley. She testified that she helped her husband build the equipment. She reviewed a scrapbook she had put together at the inception of PCI.

#### 17. *William Laurie*

RTP next called William Laurie, who had previously served as Vice President of Administration of Fiberite. He testified that he executed a shop right agreement with Hawley, to allow him to develop his invention, and that Fiberite retained a royalty-free right to exercise any patents that might issue to Hawley regarding reinforced thermoplastics. He explained that in 1980 a company named Beatrice Chemical acquired both LNP and Fiberite. Because of antitrust concerns, in 1981 the government forced Fiberite to divest itself of its LFRT division, RTP. RTP thus became an independent company, and it retained shop rights to practice the Hawley patent.

#### 18. *Malcolm L. Moore*

RTP next called Malcolm L. Moore, who at the time of trial was an intellectual property lawyer based in Minneapolis. Moore is the attorney who drafted Hawley's patents. He recounted his first meeting with Hawley, in which Hawley described his idea of passing a fiber strand over a series of lobes to spread apart the individual fibers for the purpose of wetting them with a thermoplastic resin. Moore testified that he represented Hawley in negotiating amendments to his employment agreement with Fiberite, and particularly the covenants-not-to-compete. Moore also stated the he authored the shop right agreement that granted Fiberite the authority to practice Hawley's invention.

#### 19. *David Hezzell*

RTP next presented video testimony of David Hezzell, one of the inventors of the patents at issue. He testified that the thermoplastic process he and his colleagues

developed was superior to the prior art due to numerous improvements they had made in the design of the impregnation chamber. He recited the following details of the chamber design: optimizing the tension of the strand; altering the temperature of the resin bath; changing the kinds of resins used; repositioning the spreader bars; and modifying the wrapping angle of the fiber strand around the bars. He testified that the first process he and his colleagues designed embodying these improvements became functional in early 1980, and that they continued to improve upon this process.

Hezzell further testified that the flexural modulus test provides a measure for determining the degree of wetting of individual reinforcement filaments. Hezzell recognized that the patents' specification recites that the claimed structure exhibits at least 70% of the theoretically attainable flexural modulus, and preferably 90%. And, he stated that the patent specification does not define the term "substantially completely wetted."

Hezzell testified to the validity of claim 1 of the '889 patent. He stated that Example 28 of the patents' specification gives support for the "30% by weight" limitation of this claim.

Hezzell next described the evolution of the pultrusion device developed by him and his colleagues at ICI. As corroborated by an inscription written by Cogswell in a book presented to Hezzell, Hezzell described that early prototypes of the ICI device failed, and the first functional version, the Mark 5, became operational in the summer of 1982. He testified that the products produced by the Mark 5 device originally exhibited poor wetting characteristics.

### 20. Richard Mark Wenger

RTP next presented video testimony of Richard Mark Wenger, who served as a developmental chemist for Fiberfil Company starting in 1971, and who was Vice President of Research and Development for DSM Engineering Plastics, Inc. at the time of trial. He explained that DSM had been known as Wilson–Fiberfil, or Fiberfil, since 1981, and was previously known as Dart. He testified that DSM had been sued by LNP for patent infringement, and that DSM had settled their suit with LNP once DSM decided as a strategic matter to exit the market for long fiber reinforced thermoplastics. At the time of settlement, he testified, sales of LFRTs comprised less than 5% of DSM's business. He stated that one other factor that motivated DSM's settlement with LNP was that LNP's patents had been reexamined by the PTO and were found to be valid.

Wenger, referring to an internal DSM document, stated that Fiberfil, prior to 1981, prepared fiber reinforced thermoplastic pellets containing at least 30% by volume fiber. Wenger testified that Fiberfil sold these pellets as injection molding compounds. He also stated that, prior to January 1981, Fiberfil had disclosed the use of pins or bars to improve impregnation in a hot melt impregnation meltable pultrusion process.

Wenger acknowledged that LNP had invited DSM to participate in the reexamination proceedings, and that DSM did not do so.

### 21. Harry F. Manbeck, Jr.

RTP next called Harry F. Manbeck, Jr., who had served as Patent Commissioner from 1990–92. He discussed how the PTO works. He stated that the amendments and declarations that had been presented to the jury during the course of the trial were part of the official prosecution history.

On cross-examination, Manbeck acknowledged that, while patent prosecutions are confidential proceedings, reexamination files may be obtained by the public. Reexamination proceedings, he stated, can take into consideration printed publications and patents as prior art.

### 22. *Ralph S. Charbonneau*

RTP next called Ralph S. Charbonneau, who was Technical Coordinator of the Western Region for RTP, and who had been previously called by LNP. He discussed the video that LNP had prepared demonstrating RTP's accused process. He stated that the fiber strand first enters a "preheater" device that improves the receptivity of the strand to being impregnated by resin. The strand then passes to the "die," which contains the melt chambers, in which reside spreader bars and spreader waves. The strand is spread apart in the chamber and impregnated with resin as it passes over the bars and waves. A puller device, he explained, pulls the strands through the die (thus, the name "pultrusion"). Once the strands exit the puller, they enter the pelletizer, in which they are chopped into pellets.

Charbonneau also discussed his declaration in which he recited the flexural modulus properties of a number of RTP products. He recited how he obtained the flexural modulus data. He stated that glass fiber is much heavier than polypropylene, which explains why volume percentages of fiber are less than weight percentages of fiber.

On cross-examination, Charbonneau acknowledged that flexural modulus tests are performed on molded products, not on wetted strands or pellets.

On redirect, Charbonneau stated that whenever there was a variance in flexural modulus test data, he chose the number that would give a higher flexural modulus, as would be more favorable to LNP.

### 23. *First Colloquy on Proposed Jury Instructions*

The court held a colloquy on proposed jury instructions. The parties disagreed on which claims would be submitted to the jury. LNP's proposed jury instruction stated that five claims were at issue, including claim 1 of the '262 patent and claim 6 of the '450 patent, as reexamined. RTP's proposed instruction stated that only three claims were at issue—claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined. RTP objected to the inclusion of the two other claims on the grounds that LNP gave RTP insufficient notice that these two claims would be tried to the jury. LNP did not take a firm stance on whether the two claims should be tried to the jury, stating that "at some time we will either withdraw it or the court will find it and it will go." The court stated that, if LNP elected not to withdraw the claims, then it would conduct further discussion on the matter.

LNP proposed an instruction to the jury stating that if RTP had a license to the Hawley invention, then this finding does not warrant the presumption that RTP cannot infringe the patents at issue. RTP insisted that the instruction is unnecessary, and that RTP's defense to infringement is that it is practicing the prior art. The parties agreed on the following instruction: "You many have heard that RTP may possess a license or what is known as shop rights, but there is no contention that the license or shop right itself is a defense to liability in this case."

### 24. *Laurence J. Broutman*

#### a. *direct examination*

RTP next called Laurence J. Broutman, who testified as an expert witness. He stated that he had extensively studied fiberglass-reinforced plastics. At the time of trial he was on the faculty of the Illinois Institute of Technology in the field of materials engineering. He also helped found a company called Advanced Polymer Compounding, which manufactures plastics.

Broutman gave his opinion that RTP's products do not come within the scope of the claims at issue, that the claims at issue fall within the scope of the Hattori and Bradt patents, and that claim 1 of the '889 patent, as reexamined, is indefinite or lacks support.

As to his first opinion, Broutman stated that RTP does not infringe the claims at

issue because it practices the prior art. RTP's products, he stated, are basically similar to the Hawley products and not similar to the LNP products. RTP's process, he testified, is exactly that described by Hawley in his drawings and patent. Broutman presented diagrams of the Hawley and RTP processes, and indicated the similarities between them.

Broutman testified that the characteristics of the Hawley and RTP products can be compared through flexural modulus data. Flexural modulus, he explained, is an accepted property that can be routinely measured. Citing the patent prosecution history of the ICI patents, Broutman stated that products produced by the Hawley process, as manufactured by a company known as Polymer Composites, yielded a measurement of 70% of the theoretically attainable flexural modulus. The patent applicants, he stated, asserted that their products attained 90% of the theoretically attainable flexural modulus. Broutman testified that RTP products attain a flexural modulus measurement of roughly 70%, similar to products produced by the Hawley process.

Broutman then stated that he had made comparisons of the pellets produced by RTP and PCI (Hawley's company). He testified that he studied data sheets for the two kinds of products, and stated that the flexural modulus data for the compounds were similar, but that the flexural modulus figures for the RTP products were less than for the Hawley products. The RTP compounds tested, he stated, had greater than 30% by volume glass fiber.

Broutman testified that he compared RTP products with products made according to the Hattori process. These compounds, too, he stated, gave similar flexural modulus data, with RTP products giving flexural modulus figures less than for the Hattori process.

Broutman then gave testimony supporting his opinion that the Hattori '849 patent discloses the subject matter of the patents at issue. Broutman noted that the Bradt '501 patent was disclosed in the Hattori patent, and so that the teachings of the Bradt '501 patent are incorporated by reference into the Hattori '849 patent. The Bradt '501 patent, he stated, disclosed a process for wetting each individual filament of a fiberglass strand with resin. Hattori improved on the Bradt process, Broutman testified, by teaching how to produce reinforced pellets with higher concentrations of glass fibers therein, up to 60% by volume. Broutman said that the Hattori patent would teach one skilled in the art how to mold an article in which the average fiber length would be 2 mm long, considering that the patent teaches how to achieve substantial wetting, and that this property would allow the fibers in the molded product to maintain adequate fiber lengths. He stated that the Hattori patent discloses a structure having at least 30% by volume of parallel aligned reinforcing filaments having a diameter of up to 24 microns, and that it achieves this result through a melt protrusion process. The Hattori process, he continued, would teach one skilled in the art to form molded products though a process which includes the step of subjecting the pellets to a melt homogenization process to produce a random distribution of individual filaments.

Broutman also stated that he believed that this process would result in a product wherein the fiber length is retained to the extent that at least 50% by weight of the filaments are at least 2 mm long. To support this conclusion, he presented a declaration by Robin Bailey, an ICI employee, that was submitted to the PTO in 1985 in conjunction with the prosecution of ICI's patents. Therein, she declared that she had studied the differences between ICI products and those of Fiberfil, and that she had directed the simulation of Fiberfil LFRT products. She found that, in the simulated Fiberfil products, 50% of the fibers retained a length of 5.8 mm.

### b. *cross-examination*

On cross-examination, Kenworthy first questioned Broutman with respect to written support for claim 1 of the '889 patent,

as reexamined, and Broutman declined to acknowledge that this claim is supported by the specification.

Broutman acknowledged that it is possible to weigh the filaments of a pellet by burning off the resin in an oven, thus allowing a determination of whether a pellet is comprised of 50% by weight fiber.

Then, Kenworthy questioned Broutman as to whether RTP's products infringed the claim limitation "substantially completely wetted." Broutman acknowledged that he based "virtually all" of his noninfringement opinion on flexural modulus data. Broutman recognized that three of the claims—claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined—don't recite the term "substantially completely wetted." Broutman insisted that flexural modulus is relevant to the infringement of these claims because it provides a direct measure of wetting.

With regards to the Bailey declaration, Broutman acknowledged that Bailey did not explain how she performed her analyses.

Broutman also acknowledged that he did not perform any physical testing on RTP products. He recognized that he directs a large chemistry lab that does polymer characterizations and composite characterizations and analyses, and that has a scanning electron microscope. He acknowledged, nonetheless, that he never tested RTP products, but that he based his conclusions on RTP data sheets. Similarly, he conceded that he did not perform any physical testing on prior art products.

Broutman acknowledged that he did not base his noninfringement opinion on deposition testimony of McCamley on fiber length retention and fiber dispersal of RTP products. Broutman stated that McCamley's deposition remarks were unsupported by test data, and therefore improper to rely on.

Broutman again recognized that he largely based his study of the RTP products on flexural modulus data. He agreed that to determine flexural modulus, pellets have to be subjected to a melt homogenization process, and put through an injection molding machine. This procedure, he acknowledged, may improve the wetting of the fibers, but may also result in their breakage. Broutman disputed, however, Kenworthy's suggestion that the flexural modulus of a molded bar would be much different from the flexural modulus of a wetted strand, due to the realization that the filaments in the injected specimen tend to align themselves with the length of the specimen bar. If the filaments are long enough, he stated, the filaments behave substantially like a continuous strand of rope. Broutman stated that he based his conclusions regarding PCI products on the data that was submitted to the Patent Office.

Broutman stated that his expert report was based on flexural modulus data and resin viscosity data. Kenworthy asked him if there was "nothing else in your report that went to infringement?" Broutman replied "Of course. I didn't know the court's interpretation [of the claim language] at that time." When asked if the RTP data sheets say anything about the random dispersal of filaments or fiber length retention, Broutman responded that the data sheets present flexural modulus data, which is a good indicator of wetting, which indicates random fiber distribution.

With respect to invalidity, Broutman acknowledged that the Bradt '501 patent deals with an emulsion process, not a melt protrusion process. In regards to the Hattori '849 patent, Broutman stated that quality of the pellets produced by Fiberfil is not an indicator of what the Hattori patent claimed, as Fiberfil may have sacrificed wetting to achieve better line speed and to cut costs.

### c. redirect examination

On redirect examination, Broutman referred to two portions of the February 12, 1992 letter from McCamley to McDermott, Will & Emery. First, regarding McCamley's statement that the claims of the '450 patent "would fall in line with products

made by ... RTP," Broutman stated that this statement is erroneous, noting that McCamley had stated, immediately before the quoted sentence, that the '450 patent claims technology wherein the flexural modulus is "at least 30% of the theoretically attainable flexural modulus." This 30%Figure, Broutman stated, is clearly an error, as the patent clearly refers to a 70% figure. Based on this error, Broutman stated, the alleged admission of infringement should be disregarded.

Broutman next referred to the section of the letter stating that RTP's wet-out process "is different in concept/design to the ICI patent and to the PCI/Celanese or AKZO patents." Broutman stated that McCamley was talking about ICI or PCI/Celanese patents unrelated to this claim in suit. Broutman referred to a licensing agreement between LNP/Kawasaki and Hoechst Celanese Corp (HCC)/Polymer Composites, Inc. (PCI), in which the only PCI or Hawley patent listed in a settlement agreement was U.S. Patent No. 5,041,258. Counsel for RTP asked Broutman's conclusion, in light of this licensing agreement, as to what McCamley was referring to in the February 12 letter. Upon objection, counsel withdrew the question.

Broutman reiterated that ICI had characterized their product according to flexural modulus data, and that the patents at issue teach measuring the wettedness of filaments with flexural modulus test.

Broutman also testified on redirect that the Hattori '849 patent teaches how to achieve wetting of reinforcement filaments, by opening up a fiber strand by any suitable means prior to introduction into the reservoir or while immersed in the resin reservoir. By adjusting line speed and resin viscosity, he stated, the patent teaches how to achieve thorough wetting.

### 25. Second Colloquy on Proposed Jury Instructions

During Broutman's testimony, the parties again disputed the scope of the matters that had been disclosed for the purposes of Rule 26. When Broutman was giving his opinion on the importance of a prior art reference, Kenworthy objected on the grounds that the testimony was not disclosed in Broutman's expert report. The court agreed, and then pressed the parties on whether LNP had given RTP adequate notice that two of the claims—claim 1 of the '262 patent and claim 6 of the '450 patent, as reexamined—would be raised at trial. RTP noted that these two claims are mentioned neither in LNP's discovery responses nor in Pipes' expert report. LNP argued that it was important to retain all five claims in the case, particularly in light of the flexural modulus data that had been presented to the jury. LNP contended that RTP had notice that these claims would be asserted since August, when LNP first obtained Charbonneau's declaration. The court decided that the verdict form should make no mention of claim 1 of the '262 patent or claim 6 of the '450 patent, as reexamined. The court stated that LNP would be free to assert these two claims later.

### 26. James E. Malackowski

RTP called James E. Malackowski as its last witness in its case-in-chief to discuss damages. Malackowski is a founding partner of IPC Group, a consulting firm that focuses on valuation issues in intellectual property cases. He testified that RTP's profit margin has never exceeded 5% on the accused products. He testified that, if the jury finds that LNP did not adequately mark its products as patented, that a damage award should be reduced. He outlined his methodology, and analyzed the case in light of the Georgia–Pacific factors: 1) the royalties recovered by the patentee for licensing the patents in suit to other companies; 2) the rates paid by RTP for similar technology in other deals; 3) the nature and scope of the license; 4) the established policy of LNP/Kawasaki in maintaining a patent monopoly; 5) the commercial relationship between the parties; 6) the effect of selling the patented products on the rest of LNP/Kawasaki's business; 7) the term of the license; 8) the profitability of the

product made under the patent; 9 & 10) the advantages of the patent over the old technology; 11) the extent to which the infringer used the product; 12 & 13) profit on the products and profit in the industry; 14) the opinion of experts; and 15) what the parties would have agreed to in a hypothetical negotiation. He stated that a royalty rate of 2% to 4.2% would provide a baseline figure. Because RTP had previously paid 5% royalties in other licenses, Malackowski gave his opinion that a reasonable royalty rate would be 4% of sales.

To determine the royalty base, he looked at sales of RTP products containing 30% or more fiber by volume, and found that from February 1991 through September 1998, the total sales volume is $266,-432. Multiplying this by 4% gives $10,657 in liability for royalties. For products with less than 30% fiber by volume, as would infringe the '889 patent, as reexamined, he found a sales volume of $3,045,682 from May 1993 to September 1998. Multiplying this by 4% gives $121,827 in liability for royalties.

### 27. Arthur Jeffrey Gibson
#### a. direct examination

In a response to RTP's case-in-chief, LNP called Arthur Geoffrey Gibson, who testified as an expert. Gibson has extensive background in thermoplastic pultrusion, was previously Chairman of the Reinforced Plastics Group of the U.K. Plastics Institute, and at the time of trial was a Fellow of the U.K. Institute of Materials. He testified that the flexural modulus of a molded product will be less than that of an unmolded strand, because, in the molded product, the filaments have been broken in the homogenization process.

He also testified that it is relatively easy to measure the length of the fibers in a specimen by using a computer image processing technique. By choosing a sensible location in the specimen bar, a statistically significant measurement can be made of the overall fiber length distribution.

He then gave his opinion that the Bradt and Hattori patents, alone or in combination, do not teach all the elements of any of the three claims at issue in this case. He testified that in the early 1980s, the Fiberfil products were well known, and that people were aware of the fact that they were only partially impregnated, and that the center of each injection-molding granule contained a certain amount of dry glass. He stated that if the Hattori/Bradt patents had taught substantial complete wetting, then Fiberfil would have exploited this technology to produce wet-out product.

He stated that with Bradt-type materials, fiber length can be retained in a molded product such that 50% of the material is longer than 2 mm, but in that case, there is a nonuniform product with non-dispersed strands. These products are strong, but have poor appearance. Contrarily, products could be made with well-wet, shorter fibers that give excellent appearance but reduced impact strength, he testified.

He testified that the Hawley process would not yield adequately wetted plastics. He stated that it discloses an insufficient number of spreader surfaces, and that the wrapping angle between the strand and the spreader surfaces has to be greater than that disclosed by the Hawley process in order to achieve thorough wetting. Moreover, he stated that the Hawley process is not a pultrusion process, but that the strand is pushed through the die.

#### b. cross-examination

On cross-examination, Lupo questioned Gibson on the flexural modulus properties of the ICI products and the prior art. Gibson acknowledged that the ICI products exhibited a higher flexural modulus than the prior art plastics.

Gibson stated that claim 1 of the '889 patent, as reexamined, derived written support from Example 28 of the specification.

Gibson gave his belief that flexural modulus may have been the best way of determining the degree of wetting, at least

at the time the patents-in-suit were issued. It is an imperfect method, he said, "but as they say about democracy, it beats the heck out of whatever comes second." Lupo read into the record an excerpt of Gibson's deposition testimony in which Gibson stated that products attaining 70% of the theoretically attainable flexural modulus would be considered substantially completely wetted. Gibson acknowledged that he had so testified, but that the court's claim construction ruling had established a different definition of "substantially completely wetted."

Gibson stated that one skilled in the art would consider the Hattori '849 patent in conjunction with the Bradt '570 patent and the Bradt '501 patent, as they "fit together." Gibson stated that it was unclear, however, whether the Bradt '501 patent disclosed the wetting of strands or filaments.

### c. redirect examination

On redirect, Gibson recognized that the three remaining claims at issue do not claim the invention in terms of flexural modulus. He stated that it is improbable that the flexural modulus of pellets could be determined, as they are too short to measure. He testified that he was not aware of any plastics produced prior to 1981 which achieved 70% of the theoretically attainable flexural modulus, nor 60%, nor 50%. He stated that the Bradt technology did not disclose molded plastics with randomly dispersed fibers. Gibson stated that Hawley did not direct his invention to making injection molded pellets to make molded articles, but that the idea Hawley had was to form an insert to be surrounded by resin to make a better shovel.

### 28. Ronald C. Hawley

RTP next called Ronald C. Hawley, who had previously testified, to provide rebuttal testimony. Hawley contested Gibson's testimony that Hawley's model and drawing would not work. Hawley repeated an earlier recitation of language from his patent, which stated that "[e]nough resin material 16 should be present to thoroughly cover each of the fibers 14 so that the fibers are imbedded in the material 16." He stated that his device is a pultrusion machine, with a "catapuller" pulling the material through the die. He acknowledged that one use of his technology is to make handles and inserts for snow shovels, but that these were only two embodiments thereof. He stated, moreover, that the technology claimed by his patents is a workable invention that has been used by PCI. And, he testified that PCI did not make pellets in 1981 because of the contract he had entered into with Fiberite which prevented PCI from making a pelletized material until March 1983.

On cross-examination, Hawley acknowledged that his model and his drawings depicted the same concepts. He acknowledged that the word "pultrusion" does not appear in his patents, but stated that one skilled in the art would recognize that the invention discloses a pultrusion process. He acknowledged that he had never developed a commercial embodiment employing the entry for the strand disclosed in his earlier drawings or model.

### 29. Jury Instructions

The court read the jury instructions to the members of the jury. In particular, the court instructed the jury that "substantially completely wetted" means "largely but not necessarily wholly surrounded by resin. In the context of LFRT pellets, it is surrounding the individual filaments by resin to the extent that in articles injection molded from such pellets, the individual filaments are randomly dispersed and at least 50% by weight of the filaments retain a length of 2 millimeters or greater."

### 30. LNP's Closing Argument

Kenworthy delivered the closing argument on behalf of LNP. Kenworthy explained to the jury that two claims—claim 1 of the '262 patent, and claim 6 of the '450 patent, as reexamined—had been removed from the case. This, Kenworthy explained, meant that flexural modulus was not part

of any of the remaining claims. Kenworthy repeated two themes of Broutman's expert report: 1) that RTP's pellets were not thermoformable; and 2) that "substantially completely wetted" required attaining at least 90% of the theoretical flexural modulus and also required viscosity of between 1 and 10 Newton seconds per meter squared. Kenworthy stated that both these grounds for noninfringement were rendered null by the court's claim construction opinion.

He summarized the evidence LNP had presented on infringement. He stated that the issue of infringement focuses on the claim limitation "substantially completely wetted." He recalled the internal RTP documents presented at trial and McCamley's testimony (both through depositions and in court). The documents, Kenworthy said, state that "RTP completely wets individual filaments in their long fiber products." And McCamley, Kenworthy said, had stated that RTP's products exhibit random dispersal of individual filaments. Kenworthy also recalled the testimony of Pipes, who had inspected RTP's products visually, microscopically, and through the ashing test, and who had concluded that the products do infringe. Broutman, on the other hand, had access to laboratory testing facilities, but did not test RTP's products, Kenworthy stated. And, the legal opinion procured from McDermott, Will & Emery gave no indication that RTP's products did not infringe the '450 patent, as reexamined, and the '889 patent, as reexamined, Kenworthy said.

Kenworthy recalled testimony of Miller, the President of RTP, indicating that he had not read the legal opinion issued by McDermott, Will & Emery, and believing that RTP was not liable for infringement because it had shop rights to Hawley's technology. Kenworthy emphasized to the jury that such shop rights do not constitute a defense to infringement. Kenworthy gave the jury members a confidential set of figures to aid them in arriving at an award for damages.

Kenworthy stated that Hawley's invention, as originally conceived, was to develop a pultruded thermoplastic insert to be surrounded by resin that could be thermoformed or shaped and then put in a mold and injected with additional raw resin, non-reinforced resin. Hawley's first patent, Kenworthy described, deals with this insert. This patent, moreover, discusses imbedding the fiber into the resin, not pushing the resin into the filaments, Kenworthy explained. Hawley's second patent, Kenworthy continued, deals with surrounding the strands with resin, not the individual filaments.

Kenworthy acknowledged that RTP contested that the Bradt and Hattori patents render the patents at issue invalid, but stated that Fiberfil owned all these patents, and that Fiberfil did not produce a wet-out product. These patents, he stated, did not teach how to obtain both fiber length retention and random fiber dispersal. He argued that the Patent Office, in the reexamination proceedings for the '450 and '889 patents, had considered the Hawley, Bradt, and Hattori references, and concluded that the patents were valid.

### 31. *RTP's Closing Argument*

Lupo delivered the closing argument on behalf of RTP. He argued that there has been no infringement because RTP practices what's in the prior art: the Hawley patents and the PCI data sheets. Lupo told that jury that if you practice the prior art, you can't infringe.

Lupo posed the question about how to determine if a product is substantially completely wetted. He acknowledged that the court defined this term without reference to flexural modulus. He stated, nonetheless:

Theoretically attainable flexural modulus is very much in this case. Kawasaki and LNP have told you, because its's a legal interpretation, there is a legal interpretation that goes with it, that the court has given, that it's not in the case. But you know that that is the

scientific way to measure wetting, because every witness has said it. It's very much in the case.

If it were not to be in the case, the testimony would have not have gone in in this court. There would be a statement in the legal instruction that says you're not to consider theoretically attainable flexural modulus.

There's no statement like that. It is the key point in this case. It's like watching the Wizard of Oz, which I just did three weeks ago, the remake, and saying, don't pay any attention to the man behind the curtain. Don't pay any attention to the man behind the curtain. Don't pay any attention to theoretically attainable flexural modulus. The reason is because if you pull back the curtain and see it, the case of Kawasaki/LNP crumbles, because theoretically attainable flexural modulus indicates that RTP is in the prior art.

Next, Lupo discussed how it is known that RTP's products are in the prior art. Lupo stated that flexural modulus data show that RTP's products are in the prior art, and that Cogswell had testified that fiber length retention and random fiber dispersal would result from the wetting. Lupo recited language from a document of the file history of the '262 patent which purportedly differentiated the ICI products from the prior art on the basis of flexural modulus data. The document states that prior art compounds exhibit less than 70% of the theoretically attainable flexural modulus, and that the applicants' products can attain a value of greater than 90%. Based on this statement, Lupo argued to the jury that products attaining 78% of the theoretically attainable flexural modulus would be in the prior art. All RTP's products, Lupo stated, exhibit a flexural modulus value of less than 78%, and so do not infringe.

Lupo discussed the February 12, 1992 letter from McCamley to McDermott, Will, & Emery wherein McCamley wrote that the '450 patent "would fall in line" with RTP's products, and that RTP's wet-out process is different in concept/design to the ICI patent and to the PCI/Celanese patents. Lupo stated that Broutman's testimony showed that McCamley wrote erroneously with respect to the '450 patent, and that McCamley was referring to the '258 Celanese/PCI patent, and not to the Hawley prior art that RTP purportedly practices.

Lupo recalled the LNP memorandum written by Dale Grove, stating that RTP is not infringing, because their product is 16% fiber by volume, 26% by weight, and stating that RTP must employ a means of impregnation similar to PCI's approach. This evidence, too, Lupo argued, confirms that RTP practices the prior art.

Lupo further urged that the evidence shows that RTP does not infringe because it practices the prior art. He recalled that Hawley gave Moore datasheets in July 1981 describing his novel product. These data sheets were sent to the public, Lupo stated. McCamley, Lupo said, obtained continuous strands of Hawley's product, pelletized it, toured the plant, and questioned Hawley about his process. Lupo stated that this all happened prior to November 17, 1981, Cogswell's critical date, meaning that the Hawley process is prior art. And since Hawley's PCI products exhibit the same flexural modulus properties as RTP's products, RTP must have practiced Hawley's process, Lupo concluded.

Lupo then argued that there is not written support for claim 1 of the '889 patent, and he played an excerpt of Hezzell's video testimony indicating that the "30% by weight" limitation should properly read "30% by weight and by weight of fiber."

Lupo argued that the patents at issue are invalid, and that the result of the reexamination proceedings should not suggest otherwise. He stated that LNP's replication of the Fiberfil process lacked two critical features: spreader bars and slow line speed. Since the patent examiner never saw a true recreation of the Fiberfil process, Lupo said, the PTO's decision to

issue reexamination certificates was erroneous.

On damages, RTP argued that if the jury were to find validity and infringement, then $132,485 would be the proper award if the jury finds LNP had properly marked their products, and that the award should be reduced to $73,924 if the products were unmarked.

### 32. *LNP's Rebuttal*

Kenworthy argued that RTP had failed to meet its burden of showing that the patents are invalid. The Hattori patents, Kenworthy urged, only disclose the goal of complete wetting that was aspired to be reached, but do not disclose the means for achieving this objective. The fact that Fiberfil did not produce thoroughly wetted fibers, he added, indicates that Hattori never taught how to achieve complete fiber wetting. The Bradt '570 patent, he argued, did teach the use of spreader surfaces to improve wetting, but did not suggest how to achieve complete wetting.

Kenworthy emphasized the February 12, 1992 letter from McCamley to McDermott, Will & Emery as critical evidence. He noted that RTP did not call McCamley to the stand, despite McCamley's position as Vice President of Research & Development.

### 33. *Jury Notes*

While the jury deliberated, it sent a number of notes to the attention of the court. Two of these concerned flexural modulus data. The first note reads: "Please advice if we can or cannot use the flexural modulus table as evidence for the. Thanks." The second question asks: "Can we use the *results* of the flexural modulus exhibit board as evidence of RTP products' flexural modulus (bar graph)."

Kenworthy asked the court to instruct the jury to refrain from considering such data. He stated: "I think our position is that [the jurors] need to be instructed, in our view, that flexural modulus has nothing to do with the issues before them." The court declined to make such an instruction to the jury.

### 34. *The Verdict*

On November 24, 1998, the jury returned its verdict, making the following findings: 1) that RTP's accused products do not infringe the three asserted claims; 2) that RTP did not induce infringement of claim 1 of the '889 patent, as reexamined; 3) that the asserted claims are not invalid due to anticipation; 4) that claim 3 of the '262 patent and claim 1 of the '889 patent, as reexamined, are invalid for obviousness; 5) that claim 1 of the '450 patent, as reexamined, is not invalid for obviousness; 6) that all asserted claims are invalid for indefiniteness; 7) that claim 1 of the '889 patent, as reexamined, is not invalid for failure to meet the written description requirement; 8) that RTP failed to show that LNP and Kawasaki delayed filing suit for an unreasonable and inexcusable length of time, such as would support a defense of laches; 9) that LNP and Kawasaki had adequately marked their products as patented; and 10) that RTP is not liable for damages.

### G. *Post–Trial Motions*

Both parties filed post-trial motions after the jury returned its verdict. LNP has asserted: 1) that it is entitled to judgment as a matter of law, or in the alternative, a new trial, on the issue of infringement and invalidity; 2) that it is entitled to a new trial on the issue of damages and willfulness; 3) that RTP infringes claim 1 of the '262 patent (which was withdrawn from the jury's consideration) as a matter of law, or in the alternative, that LNP is entitled to summary judgment for infringement of this claim; 4) that LNP is entitled to judgment pursuant to Rule 52 or in the alternative to summary judgment pursuant to Rule 56 that the '450 and '889 patents, as reexamined, are not unenforceable due to inequitable conduct; and 5) that LNP is entitled to summary judgment that

the patents in suit are not invalid for failure to disclose the best mode.

RTP has asserted: 1) that the court should reconsider its construction of the claim term "substantially completely wetted;" 2) that as a matter of law, claim 1 of the '889 patent, as reexamined, is invalid for lack of a written description in the specification supporting the claim limitation "30% by weight of fibre reinforced pellets;" 3) that it is entitled to judgment as a matter of law that all three asserted claims are invalid under §§ 102 and 103; 4) that it is entitled to judgment as a matter of law that all asserted claims are invalid for failure to disclose the best mode; 5) that it is entitled to summary judgment that claim 1 of the '262 patent (which was withdrawn from the jury's consideration) is not infringed and is invalid for anticipation or obviousness; 6) that RTP is entitled to summary judgment that the patents are invalid for failure to disclose the best mode; and 7) that if a new trial is granted, that RTP is entitled to judgment as a matter of law that plaintiffs failed to prove damages.

## II. DISCUSSION

### A. Reconsideration of Claim Construction

RTP has moved for the court to reconsider its construction of the claim term "substantially completely wetted." RTP seeks reconsideration in two contexts. First, it asserts that the court should define the claim term in relation to the flexural modulus test for determining wettedness. RTP notes that the court's present construction, which defines wettedness in relation to the dispersal/length test, creates "an ever-changing definition of infringement." RTP argues that improvements in injection molding technology will permit LFRT pellets of poorer quality to yield molded products with sufficiently long and dispersed filaments. It is improper, RTP argues, to establish infringement criteria in relation to technology outside the scope of the patent claims.

RTP's second argument is that the court should reconstrue the claims of the '450 patent, as reexamined, and the '889 patent, as reexamined, and find that the claim term "substantially completely wetted" is a distinct claim limitation.

■ As a procedural matter, the court may reconsider a prior ruling in three circumstances: 1) where the court has patently misunderstood a party; 2) where the court has made a decision outside the adversarial issues presented to the court by the parties; or 3) where the court has made an error not of reasoning but of apprehension. *Stairmaster Sports/Medical Products, Inc. v. Groupe Procycle, Inc.*, 25 F.Supp.2d 270, 292 (D.Del.1998). The issues presented to the court for reconsideration were directly addressed by the court in its *Markman* opinion. Because the court therein apprehended the arguments, and resolved them, there are no procedural grounds for reconsidering these issues in the present posture. For the benefit of the record, the court will consider the motion on its merits.

■ The challenged claims relate to LFRTs wherein the reinforcement filaments are "substantially completely wetted." To measure the degree of wettedness, the claims, as construed by the court, call for a determination of whether the filaments in the molded sample are randomly dispersed and sufficiently long. While this method may present complications by tying the threshold of infringement to the state of the art in injection molding technology, the same difficulties would be present if "substantially completely wetted" were measured in terms of the flexural modulus test. It was undisputed at trial that the flexural modulus test cannot be performed on a pellet. RTP's proposed construction thus requires that the strand or pellets be injection molded prior to analysis by the flexural modulus test. This measure of infringement would suffer from the same alleged deficiencies as the dispersal/length test.

Second, RTP asserts that the term "substantially completely wetted," as it appears in claim 1 of the '450 patent, as reexamined, and claim 1 of the '889 patent, as reexamined, should be a distinct claim limitation. RTP notes that both these patents, prior to being reexamined, recited the dispersal/length test as a means to determine the strength of the plastic, but that neither of the patents contained the claim term "substantially completely wetted." This term, RTP recognizes, was introduced into the claims during reexamination, with neither the '450 patent [3] nor the '889 patent [4] originally reciting this language. RTP reasons that the introduction of the term "substantially completely wetted" constitutes a further limitation upon the claims, and that this limitation serves to restrict the range of plastics covered by the claims. See Laitram Corporation v. NEC Corporation, 163 F.3d 1342, 1347 (Fed.Cir.1998).

The history of the reexamination of the patents indicates that the court's construction of the claims in question need not be amended. The file history of the '450 patent shows that the term "substantially completely wetted" was introduced into claim 1 not to distinguish the claim from the prior art, but to provide an antecedent basis for terms recited in claim 6 of the patent.

For the '889 patent, the file history indicates that the term "substantially completely wetted" was introduced to distinguish the claims from the prior art. The

examiner found that the British GB–849 reference, and the JP–653 reference, anticipated claim 1, as originally issued. The applicant indicated that these references disclosed that the plastic products claimed therein suffered from a lack of adequate wetting of the reinforcement filaments. The applicant thus introduced the language "substantially completely" to modify the term "wetting" as originally recited. The added language serves to limit the scope of the claims to those plastics where the filaments are substantially completely wetted, and where the filaments are not bundled and loose, as characterized the referenced prior art products. The court's claim construction, which states that the filaments must be "largely, but not necessarily wholly, surrounded by resin," adequately reflects this structural limitation, and does not require reconstruction.

For these reasons, RTP's motion for reconsideration of the court's claim construction is denied.

## B. Infringement

### 1. Motion for New Trial on the Issue of Infringement

#### a. Relevancy of flexural modulus evidence

LNP has filed a motion arguing that it is entitled to a new trial for failure of the court to submit certain instructions the jury. LNP contends that the court failed to instruct the jury to disregard flexural mo-

---

3. Claim 1 of the '450 patent, as originally issued, reads:
1. Pellets of reinforced thermoplastics material containing at least 30% by volume of parallel, aligned reinforcing filaments between 2 and 100 mm in length, the filaments extending through the length of the pellets, the pellets having been cut from a continuous reinforced product prepared by melt protrusion and which pellets can be injection moulded into an article in which the fibres are present in the form of randomly dispersed individual filaments at least 50% by weight of the filaments of the pellets retaining a length of greater than 2 mm in the moulded article.

4. Claim 1 of the '889 patent, as originally issued, reads:

A molded article formed from a fibre reinforced thermoplastic composition in a process which includes the step of melting and homogenizing a composition containing at least 30% by weight of fiber reinforced pellets between 2 mm and 100 mm long which pellets have filaments extending the length of the pellet, characterized in that the molded article contains reinforcing filaments in the form of individual filaments and at least 50% by weight of the filaments in the pellets being present in the molded article at a length of greater than 2 mm, the pellets having been cut from a structure of continuous, parallel, aligned, reinforcing filaments which have been wetted by a molten.

dulus measurements when deliberating on the question of infringement of the three claims remaining at issue.

■ A patent applicant specifies the metes and bounds of his or her intellectual property and thereby establishes the parameters of what constitutes infringement. There may be a number of ways to describe the properties of a given invention, and it is up to the applicant to set forth which method of description delineates the claimed device. When more than one method of description is possible, the applicant does not have to choose between the methods, but can set forth distinct independent claims, each one specifying a different method of determining infringement.

The present case involves reinforced thermoplastics whose filaments are highly wetted. The patent claims specify two alternate methods for measuring the degree of wettedness of the filaments—the flexural modulus test and the dispersal/length test. The former test allows a finding of infringement when, inter alia, the accused product yields a result of at least 70% of the theoretical attainable flexural modulus as determined by the ASTM D790–80 protocol. The latter test permits a finding of infringement when, inter alia, the filaments in an injection molded product are randomly dispersed and at least 50% by weight of the filaments retain a length of 2 millimeters or greater. The applicants set forth several independent claims, some reciting the flexural modulus test, some reciting the dispersal/length test, as alternate methods of determining infringement.

In its *Markman* opinion, the court construed the term "substantially completely wetted" without reference to the flexural modulus test. The court noted that the claims that recite the term "substantially completely wetted" delineate stiffness only in terms of the dispersal/length test. Although the flexural modulus test is relevant to the question of wettedness, the court recognized that such a test is not how the patentees chose to claim their intellectual property. Under the court's construction of the term "substantially

completely wetted," the dispersal/length test, and not the flexural modulus test, is the proper guide for determining whether the claim limitation "substantially completely wetted" is infringed.

The jury heard testimony relevant to five patent claims—claim 1 of the '262 patent; claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; claim 6 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined. Only two of these claims—claim 1 of the a '262 patent and claim 6 of the a '450 patent, as reexamined—refer to the flexural modulus test as the proper index of infringement. Both parties presented testimony and documentary evidence pertaining to the flexural modulus test and the flexural modulus properties of RTP's accused devices. Near the end of the trial, however, the court withdrew the two claims reciting the flexural modulus test from the jury's consideration. The court ordered that a separate trial would be held regarding these two claims.

The three remaining claims recite the term "substantially completely wetted." The court, in its *Markman* opinion, defined this limitation in terms of the dispersal/length test. In its instructions to the jury, the court recited its construction of the claim "substantially completely wetted," which references the dispersal/length test. Under the jury instructions, the flexural modulus test is not relevant to infringement.

In its closing argument, Lupo urged the jury to consider evidence of the flexural modulus properties of RTP's accused devices to support a finding of noninfringement. Lupo told the jury that the flexural modulus test is "the scientific way" to measure wettedness, and that the court's allowance of testimony on the flexural modulus test indicates that flexural modulus data is the proper basis for determining infringement. Lupo stated:

> So theoretically attainable flexural modulus is the only objective test that you heard in this courtroom for you to

know when substantially completely wetting has occurred.

Why is that important? Because it is the test for you to determine whether RTP practices the prior art or whether they infringe. I'm going to explain that.

Theoretically attainable flexural modulus is very much in this case. Kawasaki and LNP have told you, because it's a legal interpretation, there is a legal interpretation that goes with it, that the Court has given, that it's not in the case. But you know that that is the scientific way to measure wetting, because every witness has said it. It's very much in the case.

If it were not to be in the case, the testimony would have not have gone in in this court. There would be a statement in the legal instruction that says you're not to consider theoretically attainable flexural modulus.

There's no statement like that. It is the key point in this case. It's like watching the Wizard of Oz, which I just did three weeks ago, the remake, and saying, don't pay any attention to the man behind the curtain. Don't pay any attention to the man behind the curtain. Don't pay any attention to theoretically attainable flexural modulus. The reason is because if you pull back the curtain and see it, the case of Kawasaki/LNP crumbles, because theoretically attainable flexural modulus indicates that RTP is in the prior art.

The jury was apparently influenced by Lupo's remarks, as is evidenced by the two notes the jury sent to the attention of the court during jury deliberations. The first note says: "Please advice if we can or cannot use the flexural modulus table as evidence for the. Thanks." The second question asked: "Can we use the *results* of the flexural modulus exhibit board as evidence of RTP products' flexural modulus (bar graph)."

In light of the jury's attention to the flexural modulus data, LNP asked the court to instruct the jury to refrain from considering such data. Kenworthy stated: "I think our position is that [the jurors] need to be instructed, in our view, that flexural modulus has nothing to do with the issues before them." The court declined to make such an instruction to the jury.

■ LNP has filed a motion under Rule 59 for a new trial on the question of infringement.[5] The court will grant a motion for a new trial for failure to make a proposed jury instruction when the movant can demonstrate that the jury instructions actually given were fatally flawed and that the requested instruction was proper and could have corrected the flaw. *Biodex Corporation v. Loredan Biomedical, Inc.,* 946 F.2d 850, 862 (Fed.Cir.1991); *see also Johns Hopkins Univ. v. CellPro,* 931 F.Supp. 303, 312 (D.Del.1996).

The instructions provided to the jury were literally correct, as they instructed the jury to determine infringement of the term "substantially completely wetted" in terms of the dispersal/length test. The jury, however, had heard extensive testimony on the flexural modulus test. Once the two claims—claim 1 of the '262 patent and claim 6 of the '450 patent, as reexamined—had been removed from the jury's consideration, the evidence presented on flexural modulus was no longer relevant to determining infringement of the remaining claims at issue. Lupo encouraged the jury to rely on flexural modulus data in arriving at an infringement verdict, and indicated that the court's silence on the matter constituted approval of such a methodology. The jury's confusion was apparent when it sent two notes to the court's attention asking whether it could use flexural modulus data. In light of this confusion, it is

5. Rule 59 of the Federal Rules of Civil Procedure provides:
(a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

clear that the court's instructions to the jury were inadequate, and that it was error to decline to instruct the jury that it was not to rely on the flexural modulus data for its verdict on infringement.

### b. *RTP's defense that it was practicing the prior art*

RTP maintains that it was practicing the prior art, and that evidence of flexural modulus was properly introduced to support this defense to infringement. RTP presented unrebutted evidence that its own products yield flexural modulus figures that are lower than comparable data for prior art plastics. Because RTP's plastics give lower flexural modulus results than prior art plastics, RTP reasons, its reinforcement filaments are less thoroughly wetted that those of the prior art. As such, RTP contends that the flexural modulus data shows that RTP is practicing the prior art, and not infringing LNP's patents.

Section 282 of the patent code enumerates the affirmative defenses that may be raised in actions involving the validity or infringement of a patent.[6] With respect to infringement, a defendant may show "noninfringement, absence of liability for infringement or unenforceability." The statute also permits defendants to raise a defense based on "any other fact or act made a defense by this title." A review of Federal Circuit caselaw indicates that the law does not recognize RTP's defense to infringement that it is merely practicing the prior art. *Cf. Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535 (Fed. Cir.1987) (disclaiming the notion that invalid claims cannot be infringed).

■ Here, Lupo encouraged the jury to look to flexural modulus data in determining whether RTP literally infringes the patents at issue. Flexural modulus, however, is not legally relevant to the question of infringement. The jury instructions make no mention of flexural modulus being at issue with respect to infringement. It was improper for Lupo to ask the jury during closing arguments to rely on flexural modulus data. It appears that the jury was mislead by Lupo, as they returned two notes to the court during deliberations regarding flexural modulus. Although flexural modulus data is relevant to the question of invalidity, as is discussed below, it was error for the court to fail to instruct the jury that flexural modulus is irrelevant to the question of infringement.

With respect to the question of infringement, LNP's motion under Rule 59 for a new trial is granted.

### 2. *LNP's motion for judgment as a matter of law for infringement*

LNP has moved for judgment as a matter of law that RTP's accused products infringe the asserted claims. LNP asserts that the undisputed record evidence presented by plaintiffs at trial establishes that RTP's accused products meet each element of the claims at issue.

■ LNP bears the burden of proof to show that RTP infringes the patents at issue, and this burden is especially high in the present posture of the case. The court may grant JMOL in favor of a party bearing the burden of proof only where (1) the movant has established its case by evidence that the jury would not be at liberty to disbelieve; and (2) the only reasonable conclusion is in the movant's favor. *Mycogen Plant Science, Inc. v. Monsanto Co.*, 61 F.Supp.2d 199 (D.Del.1999) (quoting *Nobelpharma AB v. Implant Innovations,*

---

6. Section 282 provides that the following defenses may be asserted in any action involving the validity or infringement of a patent:
(1) Noninfringement, absence of liability for infringement or unenforceability,
(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,

(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement or sections 112 or 251 of this title,
(4) Any other fact or act made a defense by this title.

*Inc.,* 141 F.3d 1059, 1065 (Fed.Cir.1998)) (citations omitted). *See also* 9A Wright & Miller, Federal Practice & Procedure § 2535, at 325–28 (3d ed.1995) (noting that courts often caution that granting JMOL for party bearing burden of proof is "reserved for extreme cases.").

### a. *evidence supporting infringement*

■ LNP presented substantial evidence that RTP's products infringe the claims at issue. When LNP learned that its customers were using RTP products, LNP conducted an infringement analysis of its competitors' products, including two samples of RTP products-RTP types 84009 and 69803. LNP designed the testing protocol in conjunction with its patent counsel, and the procedures for the analyses are enumerated in Section I.F.7 of this opinion. LNP determined that both the RTP samples yielded a glass content of greater than 30% by volume, with RTP 84009 exhibiting a glass volume of 30.229%, and with RTP 68903B exhibiting a glass volume of 30.0285%.

The RTP samples were molded, and an LNP technician, Daria Miller, performed a computer-aided histogram analysis of the lengths of the reinforcement fibers. The laboratory notebooks that she kept show that she calculated the "weight-average length" of the fibers, and that depending on the calculation methodology employed, at least 50% by weight of the filaments in RTP sample number 84009 had a length of 2.2 or 2.3 mm. For RTP sample number 68903B, the calculations resulted in a weight-average length of 3.6 or 3.8 mm, depending on the methodology used. These calculations are corroborated by deposition testimony of McCamley, who admitted that filaments in RTP LFRT molded pellets retain a length greater than 2 mm.

Pipes analyzed the samples to determine if the filaments therein were randomly dispersed. According to his testimony, he cut open the pellets and visually inspected them, and found no loose, unwetted fibers. Analysis of the samples under a microscope confirmed his findings that the individual filaments were each coated with polymer. He then inspected injection-molded articles, and looked for bundling of fibers, and found that the filaments were uniformly distributed on the surface of the specimens. He testified that this was indicative that the filaments were well-distributed throughout the specimens. He also analyzed samples of RTP molded products that had been ashed, so that he could inspect the filament skeleton of the specimens. He found that the fibers were intermeshed and randomly dispersed in each of the specimens analyzed. Pipes' findings are corroborated by deposition testimony of McCamley, who stated that the filaments in RTP test bars have a random dispersion.

LNP also notes that RTP had requested an opinion from McDermott, Will & Emery to clarify whether RTP was infringing the ICI patents, or whether these patents were invalid. The opinion letter states that RTP is not infringing the '262 patent for the reason that RTP does not sell unpelletized strand. LNP points out, however, that the opinion letter gives no indication that RTP is not infringing the other patents at issue.

As to the other claim limitations besides "substantially completely wetted," the court finds that the evidence at trial shows that these limitations read upon RTP's accused products. The testimony of Pipes and McCamley establish that certain of RTP's products are comprised of at least 30% by volume of parallel aligned reinforcing filaments. That these reinforcing filaments have a diameter of up to 24 microns is supported by the testimony of Pipes and McCamley. The testimony of both Pipes and McCamley establish that RTP structures have been prepared by a continuous melt pultrusion process. The testimony of Pipes and McCamley, moreover, states that RTP's products are thermoformable.

### b. *evidence supporting noninfringement*

To contest LNP's allegations of infringement, RTP presented an internal LNP memorandum written by Dale Grove in 1990. That memorandum states that RTP

does not infringe LNP's patents, because their product is 16% fiber by volume, and 26% fiber by weight. This memorandum, however, is not convincing evidence of noninfringement. The fibers in the pellets analyzed are carbon fibers, not glass fibers. And, the memorandum was written in 1990, before either the '450 or '889 patents issued.

The thrust of RTP's noninfringement argument is that it cannot infringe the patents at issue because it is practicing the prior art. Lupo repeatedly articulated this theory in his closing argument. But, as stated above, the patent laws do not recognize as a defense to infringement the assertion that one is practicing the prior art. *See* 35 U.S.C. § 282; *Spectra–Physics,* 827 F.2d at 1535. RTP put forth voluminous evidence, largely based on flexural modulus data, to show that its products were within the prior art. This evidence is relevant to invalidity of the patents at issue. It is not, however, relevant to an infringement analysis.

RTP attempted to rebut the infringement data put forth by LNP. Deposition testimony of Daria Miller, LNP's laboratory analyst, suggested that the testing methodology was subjective in nature. The cross-examination of LNP's expert, Pipes, was limited to the fact that Pipes had no specific knowledge of the inner workings of RTP's pultrusion chamber, and that Pipes had not accounted for flexural modulus calculations in his analysis. This testimony, however, does not provide the court with reason to discredit the infringement data put forth by LNP.

Based upon a review of the evidence presented at trial, the court concludes that no reasonable jury could have found that RTP does not infringe claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined. Rather, the court finds that the only reasonable conclusion is that RTP does infringe these three claims. Accordingly, LNP's motion for judgment as a matter of law, with respect to infringement, is granted.

## C. *Invalidity*

### 1. *Indefiniteness*

LNP has filed a motion for judgment as a matter of law to overturn the jury's verdict that all three claims remaining before the jury are invalid for indefiniteness.

The indefiniteness doctrine derives from the second paragraph of 35 U.S.C. § 112, which provides that the specification of a patent "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The purpose behind the doctrine is to ensure that claims are drafted with sufficient clarity such that persons skilled in the art are informed of the boundaries of the claimed intellectual property, and experimentation and invention may freely proceed outside those bounds. *See Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.,* 73 F.3d 1573, 1581 (Fed.Cir. 1996).

■ The general test for determining whether a claim meets the definiteness requirement is " 'whether one skilled in the art would understand the bounds of the claim when read in light of the specification.' " *Process Control Corporation v. Hydreclaim Corp.,* 190 F.3d 1350, 1358 n. 2 (Fed.Cir.1999) (quoting *Personalized Media Communications, LLC v. International Trade Commission,* 161 F.3d 696, 705 (Fed.Cir.1998)). This is a fact-based inquiry that requires the presentation of evidence to ascertain what artisans of ordinary skill would understand the claims to mean. As such, the court defers to the jury's verdict to the extent that it is supported by substantial evidence. *See GNB Battery Technologies, Inc. v. Exide Corp.,* 876 F.Supp. 582, 597 (D.Del.1995).

■ When a claim is challenged as being quantitatively indefinite, the court looks to whether the claimed technology permits a precise measure of infringement. When the claim limitation cannot be delineated with a precise measure, the law only requires that the claim be expressed as

precisely as the subject matter permits. *See Andrew Corporation v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821 (Fed.Cir. 1988). When quantification is possible, numerical precision is not required. *See Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed.Cir. 1984). When words of degree-such as "substantially"—are used in the claim language, the court looks to whether the patent provides some standard for measuring that degree. *See id.*

The present dispute concerns whether the claim term "substantially completely wetted" is definite. The term "substantially completely wetted" is nowhere recited in the specification of the patent, and repeated testimony was presented during trial to emphasize this point. If the specification were the only source of guidance as to what the term means, then this court would not hesitate to uphold the jury's verdict of indefiniteness. The term "substantially completely wetted," however, is defined by the claims of the patent. Claim 3 of the '262 patent, for example, recites that the filaments must be sufficiently wetted such that they are capable of becoming randomly distributed in the melt homogenization process, and such that they attain a numerically-defined distribution of filament lengths once injected. Claim 1 of the '450 patent, as reexamined, and claim 1 of the '889 patent, as reexamined, also recite these limitations. To the extent that these limitations in the latter two patents do not expressly qualify the term "substantially completely wetted," a reading of the claims of the '262 patent and the shared specification indicates that these limitations do provide a measure of the wettedness of the fiber.

Recognizing that the measure of "substantially completely wetted" is recited in the claims of the patents at issue, the court looks the specification to determine if its text sufficiently describes the bounds of the claims to people of ordinary skill in the art. *Process Control*, 190 F.3d at 1358 n. 2.

The term "random distribution of individual filaments" as recited in the claim language, is essentially a mathematical limitation describing the dispersal of reinforcement filaments throughout a molded product. The term does not lend itself to a more precise definition. The specification provides further explanation of the meaning of this claim term. It states: "The extrudate formed in the process contains randomly dispersed fibres so that the only orientation of fibres in the shaped article is that which might arise as a result of the compression process." U.S. Patent No. 4,559,262, col. 10, 11, 20–23. No evidence was presented at trial to suggest that this claim term could not be understood by persons of ordinary skill in the art.

The second aspect of the definition of "substantially completely wetted" is that the filaments, once forced through an injection molding apparatus, retain sufficiently long filaments. In particular, the patent claims recite that 50% of the fibers by weight must have a length of at least 2 mm. This measure of infringement is clear. As described at trial, the polymer in pellets can be "ashed," and the fibers that remain can be measured and weighed by computer. The language of the specification, moreover, explains how this length distribution is related to the degree of wetting of the fibers. The specification states that

> the fiber length in the pellet is retained to a much greater extent in articles fabricated from the pellets of the invention than when using the prior art products. This greater retention of fibre length is believed to be a result of the greater protection afforded to the individual reinforcing filaments in the product of the invention by virtue of the good wetting by polymer which arises from use of the processes hereinbefore described.

*Id.*, col. 9, 11. 21–29. No evidence presented at trial suggests that this measure of infringement fails to adequately describe the bounds of the claim language to persons of ordinary skill in the art.

The claim term "substantially completely wetted" is not recited directly in the

text of the specification. The claims, however, define this limitation in terms of the random dispersal of the filaments in an injected product, and in terms of the length distribution of those filaments. These two criteria are both quantifiable measures whose meanings receive explanation in the specification. No evidence was put forth at trial that either of these two criteria cannot be readily understood by persons of ordinary skill in the art. Thus, the court finds that a reasonable jury could not find that the claim limitation "substantially completely wetted" is indefinite. LNP's motion for judgment as a matter of law that the claims are not indefinite is granted.

### 2. *Written Description*

RTP has filed a motion for judgment as a matter of law, seeking to overturn the jury verdict that claim 1 of the '889 patent, as reexamined, is not invalid for lack of a written description. RTP asserts that the claim, which recites "a composition containing at least 30% by weight of fibre reinforced pellets," is invalid for lack of a written description in the specification.

In its briefing on claim construction, RTP argued that the present wording of the claim is the result of an error in the prosecution of the '889 patent. RTP recognized that the preamble of the patent states that ICI has produced fiber-reinforced structures "containing at least 30% by volume of reinforcing filaments," not 30% by weight of fiber-reinforced pellets. RTP noted that the '262 and '450 patents claim structures with "at least 30% by volume of parallel aligned reinforcing filaments," and that the claim language of the '889 patent is not found in the patents' shared specification.

RTP also referred to a 1990 letter written by J.M. Downer, a patent attorney for ICI, that was addressed to the European Patent Office, and that related to the European counterpart of the '889 patent. In that letter, Downer requested the correction of an error he had discovered in the patent application, with the purportedly erroneous language closely resembling the language of the claim presently in question. Downer wrote: "An error has been noticed in claim 9 (now claim 8) in that the requirement should be that the composition contains 'at least 30% by weight of fibres in the form of reinforced thermoplastics pellets', rather than 'at least 30% by weight of . . . . . . pellets'." RTP argued that this letter regarding the European counterpart of the '889 patent, as corroborated by the lack of written support in ICI's U.S. patents for the claim language in question, shows that the claim limitation "containing at least 30% by weight of fibre reinforced pellets" is the result of a claiming error.

RTP argued in its briefing on claim construction that the court should construe the claims in light of this alleged error. RTP contended that claim 1 of the '889 patent, as reexamined, should be limited to those plastic compositions molded from pellets that contain at least 30% fiber by volume. RTP urged the court to construe the claim to read "[t]he composition must contain at least 30% by weight of fibre reinforced pellets which pellets in turn contain at least 30% by volume of fibre."

The court declined to adopt the proposed construction. In a pre-trial conference, the court explained that claim construction is a legal exercise wherein the court construes the claims as written. The court recognized that claims should be construed as written, because the public is on notice of the literal wording of claims. *See Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948 (Fed.Cir.1993) ("It would not be appropriate for us now to interpret the claim differently just to cure a drafting error made by Hoganas. That would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention."). The court suggested that if there had been an error in the prosecution of the claims, then the claims would be found invalid or unenforceable at trial for indefiniteness or for lack of a written description.

At trial, RTP presented evidence to support its contention that claim 1 of the '889 patent, as reexamined, is invalid for lack of a written description in the specification. The evidence included the Downer letter discussed above and the language of the specification and preamble of the patents in suit, which does not expressly disclose that the claimed composition contains "at least 30% by weight of fibre reinforced pellets." RTP also presented deposition testimony of David Hezzell, a co-inventor of the claimed invention, who stated that he interpreted the claim to mean that the composition "contains at least 30% by weight of fiber." Hezzell also stated therein that "I don't understand the concept of a percent by weight of pellets."

To rebut RTP's allegation, a number of LNP's witnesses testified that Example 28 of the patents' shared specification, which is discussed below, provides a written description of the challenged claim limitation.

The jury found that claim 1 of the '889 patent, as reexamined, is not invalid for lack of a written description.

Section 112 of the Patent Act provides that the specification of a patent "shall contain a written description of the invention." 35 U.S.C. § 112. This provision requires a patent applicant to "convey with reasonable clarity to those skilled in the art that ... he or she was in possession of the invention." *Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563–64 (Fed.Cir.1991). The description must " 'clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed.' " *Id.* (quoting *In re Gosteli,* 872 F.2d 1008, 1012 (Fed.Cir.1989)). This requirement prevents the inventor from "pretending that his invention is more than what it really is." *Id.* (quoting *Evans v. Eaton,* 20 U.S. (7 Wheat.) 356, 5 L.Ed. 472 (1822)). Similarly, the requirement " 'guards against the inventor's overreaching' " by insisting that the invention be adequately described. *Id.* (quoting *Rengo Co. v. Molins Machinery Co.,* 657 F.2d 535 (3d Cir.1981)).

■ The issue of whether the written description requirement has been satisfied is a question of fact. *Suntiger, Inc. v. Scientific Research Funding Group,* 189 F.3d 1327, 1334 (Fed.Cir.1999). The Federal Circuit has articulated few general principles to establish what constitutes an adequate description, and has recognized that the requirement admits of a case-by-case analysis. *In re Alton,* 76 F.3d 1168, 1172 (Fed.Cir.1996). In the present posture of the case, RTP bears a heavy burden of proof. The court will uphold the jury's verdict if the evidence presented by LNP is sufficient to permit a reasonable jury to find that the challenged claim is adequately described. *See Mycogen Plant Science, Inc. v. Monsanto Co.,* 61 F.Supp.2d 199 (D.Del.1999).

LNP asserts that the specification does provide a written description of the challenged limitation. The specification provides fifty examples to illustrate the invention. LNP points to Example 28, which reports a number of tests that were conducted on specimens comprising varying percentages of short fiber and long fiber reinforced plastics. These various specimens were subjected to impact tests to determine their failure energy. LNP notes that the tests involved specimens that comprised between 15% and 60% long fibers, by weight. The long-fiber plastic used in Example 28 is prepared according to Example 3, which states that the pellets used contain 50% to 65% glass fiber by weight. Presumably performing a mathematical conversion using a 60% fiber load in the pellets, LNP reasons that the plastic products tested in Example 28 must have contained between 25% and 100% long-fiber reinforced pellets, by weight. This example, LNP argues, provides a written description for the claim language that recites the use of a "composition containing at least 30% by weight of fibre reinforced pellets."

■ For a claim to be adequately described, the specification must describe the claimed invention with "reasonable clari-

ty." *Vas–Cath*, 935 F.2d at 1563. It is not fatal that the purported description cited by LNP is found only in the twenty-eighth of fifty examples put forth in the specification. Nor does the fact that the alleged description is found solely in numerical data preclude LNP from relying on this example as a written description of the claim. The example, however, is clearly directed toward experimental results that show that increased loading of long fiber imparts increased strength to the specimen. The example does not facially describe that specimens should contain at least 30% more pellets by weight. To arrive at this conclusion, a reader of the specification has to identify Example 3 as describing the components of the pellets, and then must perform a mathematical conversion to arrive at the figures cited by LNP.

 RTP has presented substantial evidence indicating that the present language of claim 1 of the '889 patent, as reexamined, is the result of a drafting error. LNP's rebuttal consists of the assertion that Example 28 of the specification provides ample support to uphold the claim as written. Example 28, however, does not provide direct support for the claim language, but can only be construed as supporting the claim once the data recited therein are mathematically converted using figures from Example 3. In light of the substantial evidence indicating that the wording of the claim is the result of a drafting error, the court rules that a reasonable jury could not find that these converted figures constitute a written description of the challenged claim for the purposes of section 112 of the Patent Act.

RTP's motion for judgment as a matter of law that claim 1 of the '889 patent, as reexamined, is invalid for lack of written description is granted.

### 3. *Anticipation*

RTP has filed a motion for judgment as a matter of law that the three claims tried to the jury—claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined—are invalid for anticipation. 35 U.S.C. 102.

 To anticipate a claim, a prior art reference must disclose every feature of the claimed invention, either explicitly or inherently. *Hazani v. United States International Trade Commission*, 126 F.3d 1473, 1477 (Fed.Cir.1997). A property is inherent in a prior art reference when it is necessarily present in the reference. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed.Cir.1991). Inherency may not be established by probabilities or possibilities; rather, the stated property must be a technological fact of the reference. *Id.* (citing *Hansgirg v. Kemmer*, 102 F.2d 212, 214 (CCPA 1939)). Whether a characteristic is inherent to a prior art reference is a question of fact. *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1346 (Fed.Cir.1999); *Hazani*, 126 F.3d at 1477.

The court will uphold the jury's verdict that the asserted patents are not anticipated unless RTP can show that no reasonable jury could have so concluded. *See Mycogen Plant Science, Inc. v. Monsanto Co.*, 61 F.Supp.2d 199 (D.Del.1999). If a reasonable jury could find that one or more elements of the patent claims are not found in the purportedly anticipatory reference, then the court will uphold the verdict. *See Hazani*, 126 F.3d at 1477.

 All the prior art references discussed herein were presented to the PTO during the reexamination proceedings for the '450 and '889 patents. The fact that the prior art references were expressly considered by the PTO during the reexamination proceedings constitutes evidence that the patents at issue are not anticipated by these references. *See Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed.Cir.1990); *Johns Hopkins Univ. v. CellPro*, 931 F.Supp. 303, 321 (D.Del. 1996).

 The critical limitation found in the three claims at issue is that the reinforcement filaments are "substantially com-

pletely wetted." As discussed above, the court has construed this term to require that two properties be present in a structure molded from the claimed plastic: 1) that the filaments be randomly dispersed; and 2) that at least 50% of the filaments by weight have a length of at least 2 mm. For a prior art reference to anticipate the claims, both of these properties must be disclosed by the reference, either expressly or inherently. *See id.*

RTP presented extensive evidence at trial to support its assertion that the prior art references at issue disclose fiber-reinforced plastics wherein the reinforcement filaments are well-wet by resin. Whether the prior art discloses wet-out fiber-reinforced plastics is certainly relevant to the question of anticipation. As Cogswell testified, filaments that are completely wetted by resin become lubricated, such that they do not clump together, and such that they do not break when forced through an injection molding machine. A showing that the prior art revealed plastics with completely wet-out reinforcement filaments would raise the issue of whether these plastics would inherently exhibit the properties of fiber dispersal and length retention.

Whether a prior art reference would inherently exhibit a given property is a question of fact. *Atlas Powder,* 190 F.3d at 1346. The evidence must demonstrate that the inherency of a property is not merely a probability or a possibility, but is a technological fact. *Continental Can,* 948 F.2d at 1268–69. Thus, RTP bears an evidentiary burden of showing that when the prior art plastics are introduced into an injection molding apparatus, and molded, the reinforcement filaments therein necessarily become randomly dispersed, and that at least 50% of the filaments, by weight, necessarily retain a length of at least 2 mm. Following is a review of the evidence presented at trial regarding the various prior art references at issue.

a. *the Hawley prior art invention*

RTP asserts that the Hawley prior art invention, which includes the teachings of U.S. Patent No. 4,439,387; U.S. Patent No. 4,312,917; and other of Hawley's documents, anticipates the patent claims at issue. RTP called Ronald Hawley to the stand. During his testimony, Hawley discussed the genesis of his invention, and described the process by which he produces the plastic claimed in his patents. He testified that his '387 and '917 patents disclose that, in his claimed invention, "enough resin material should be present to thoroughly cover each of the fibers so that fibers are imbedded in the material."

A review of the record shows that Hawley never indicated that his plastics inherently have the characteristics of filament dispersal and filament length retention. Nor did Broutman, RTP's expert witness, testify that Hawley's products would exhibit such characteristics. Although filament dispersal and filament length retention might be inherent properties of Hawley's invention, no testimony thereto was presented to the jury.

b. *Hattori*

Broutman testified that the product claimed by the Hattori '849 patent would inherently yield, in a molded products, filaments that retain a weight-average length greater than 2 mm. Broutman stated that Hattori teaches how to achieve substantial wetting, and that this permits the filaments of the plastic to maintain adequate lengths.

To support his conclusion, Broutman presented a 1990 declaration made by Robin Bailey on behalf of ICI to the PTO during the prosecution of an ICI patent. Bailey therein declared that she had prepared three samples of LFRTs: (A) an ICI product with a high level of impregnation by using optimum wetting conditions; (B) an ICI product using a high throughput speed to reduce the level of impregnation; and (C) a simulation of a Fiberfil product. She declared that she measured the weight-average length of the filaments in a molded product, and found that the Fiberfil products yielded a weight-average length of 5.88 or 5.81 mm, depending on

whether the skin or core, respectively, of the samples was measured. Broutman asserted that this evidence shows that the Hattori patent would teach one skilled in the art to make plastics with a weight-average length of at least 2 mm.

The court notes that the Bailey declaration, alone, cannot support a finding of inherent anticipation. Even if the declaration is sufficient to show that the Hattori patent teaches how to produce plastics with adequate filament length retention, it does not show that the Hattori patent discloses plastics whose reinforcement filaments become randomly dispersed in a molded product. On the contrary, the Bailey declaration states that the simulated Fiberfil product yielded a "poor level of impregnation." This report is consistent with other evidence presented at trial, including testimony of Hawley, that Fiberfil products are not thoroughly wet-out. In light of the evidence that the Fiberfil products are not thoroughly wet-out, it cannot be said with certainty that the reinforcement filaments in the Fiberfil products become randomly dispersed in a molded article.

The court finds that, with respect to the Hawley prior art invention and the Hattori '849 patent, RTP has not met its evidentiary burden of showing that these references teach the creation of plastics with the characteristics of filament dispersal and filament length retention. Accordingly, the court denies RTP's motion for judgment as a matter of law that the claims at issue are invalid for anticipation.

### 4. Obviousness

The jury found that two of the patent claims at issue (claim 3 of the '262 patent, and claim 1 of the '889 patent, as reexamined) are invalid for obviousness, and found that the third claim (claim 1 of the '450 patent) is not. In response to this verdict, the parties have filed three motions: 1) LNP's motion for a new trial, asserting that error committed by this court prejudiced the verdict; 2) LNP's motion for judgment as a matter of law that the claims found to be obvious are not

invalid; and 3) RTP's motion for judgment as a matter of law that claim 1 of the '450 patent, as reexamined, is invalid for obviousness.

■ The obviousness inquiry stems from Section 103 of the Patent Act, which provides that a patent may not be obtained when the differences between the subject matter sought to be patented and the prior art are such that "the subject matter as a whole would have been obvious to a person having ordinary skill in the art." 35 U.S.C. § 103. It is axiomatic that the obviousness inquiry proceeds in light of the precise claims at issue. *See Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (emphasizing difference between the prior art and the claims at issue as critical inquiry of an obviousness analysis).

#### a. *motion for new trial*

■ LNP has filed a motion pursuant to Rule 59 for a new trial on the question of obviousness. The court recognizes that the error that prejudiced the infringement portion of this case similarly tainted the obviousness verdict. For the jury to determine whether the claims at issue are invalid for obviousness, it had to recognize the proper construction of the claims. As is described above, events at trial strongly indicate that the jury was misled to apply an inappropriate standard for determining the bounds of the claims. Absent such an understanding, the jury could not properly perform its task of discerning the differences between the prior art and the claims. *See Graham*, 383 U.S. at 17, 86 S.Ct. 684. The failure of the court to properly instruct the jury as to the proper construction of the claims thus provides adequate grounds for granting a new trial on obviousness.

#### b. *motions for judgment as a matter of law*

■ RTP has filed a motion for judgment as a matter of law that claim 1 of the '450 patent, as reexamined, is invalid

for obviousness. Patents are presumed valid. 35 U.S.C. § 282. RTP must demonstrate by clear and convincing evidence that the patents at issue are invalid for obviousness. *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1351 (Fed.Cir. 1998).

 The obviousness test is more flexible than that for anticipation. Whereas a single prior art reference that does not disclose all elements of a claimed invention cannot be anticipatory, that reference may render the claimed invention obvious. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir.1983). Two or more references may be combined to demonstrate obviousness, but the prior art must provide a suggestion or motivation to combine the references. *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1355 (Fed.Cir.1999).

 Evidence that it would have been "obvious to try" a given invention is insufficient to support a finding of obviousness. *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir.1988). An "obvious to try" situation exists when a general disclosure may pique the scientist's curiosity, such that further investigation might be done as a result of the disclosure, but the disclosure itself does not contain a sufficient teaching of how to obtain the desired result. *In re Eli Lilly & Co.*, 902 F.2d 943, 945 (Fed.Cir. 1990).

In the context of composition of matter patents, a finding of obviousness is appropriate when prior art references, either individually or in combination, disclose a structure similar to the claimed invention. *In re Dillon*, 919 F.2d 688, 692 (Fed.Cir. 1990). The fact that a claimed composition possesses a property not disclosed by the prior art does not defeat an obviousness defense. *Id.* The claimed invention should not be rendered invalid when the claimed composition possesses unexpectedly improved properties or properties that the prior art does not have. *Id.*

 The patents at issue claim long fiber reinforced plastics. The key aspects of the invention are that reinforcement filaments become thoroughly wetted during the pultrusion process; that the filaments become randomly dispersed as the pellets are melted and mixed; and that the filaments retain their length as they are forced through an injection molding apparatus. Evidence presented at trial indicates that many aspects of the structure of these plastics were already disclosed in the art at the time of invention.

To support its obviousness argument, RTP presented extensive evidence relating to the flexural modulus properties of prior art plastics and of the claimed invention. Although the court finds that such data was inappropriate for the jury to rely upon in an infringement analysis, the court recognizes that such data can be relevant in an obviousness inquiry. The flexural modulus of a specimen is directly related to the degree of wetting of the reinforcement filaments. Given the flexural modulus of a specimen, it is possible to extrapolate backwards to determine how thoroughly wetted the reinforcement filaments were in the pellets and strand. The finding that plastic pellets contain thoroughly wetted filaments may be adequate to support an obviousness verdict, even absent an express showing that the injected polymer yields randomly distributed filaments and sufficient filament length retention. These claimed properties may be viewed as inherent characteristics that naturally result from the wettedness of the filaments. *See Continental Can*, 948 F.2d at 1268. It is not necessary that these properties be expressly disclosed by the prior art to support a finding of obviousness. *Dillon*, 919 F.2d at 693. For these reasons, the court recognizes that flexural modulus data can be relevant to a determination of obviousness.

Evidence that prior art plastics exhibit a certain degree of wetting, however, is not alone sufficient to support a finding of obviousness. To support a finding of obviousness, RTP must present clear and convincing evidence that it would have been obvious to make a plastic whose filaments

become randomly dispersed in the injection molding process, and whose filaments retain a weight-average length of at least 2 mm. Evidence that prior art plastics are thoroughly wet is merely predicate to the ultimate finding of obviousness.

As discussed above, Broutman testified on behalf of RTP that the prior art teaches the production of LFRTs whose filaments retain a weight-average length of greater than 2 mm when injection molded. This assertion is corroborated by the 1990 declaration of Robin Bailey.

Undisputed testimony also indicates that the prior art taught that reinforcement filaments could be completely wetted, and that thorough wetting yields desirable characteristics in plastics. Cogswell testified that, at the time of invention, thermoplastics with short reinforcement fibers were in common use, and that these short filaments were completely wetted.

The prior art patents at issue in this case indisputably disclose that it would be desirable to design plastics with long fibers that are completely wet-out. The Bradt '501 patent, for example, discloses the desirability of achieving thorough wetting of long reinforcement filaments.

The evidence does not show, however, that it would have been obvious to design a plastic whose filaments retain a weight average length of at least 2 mm and whose filaments are randomly dispersed in an injection molded product. The Bailey declaration, for example, states that the Fiberfil products, although having adequate filament length retention, had a "poor level of impregnation," and presumably had poor filament dispersion, as well. And, the flexural modulus data presented by RTP is insufficient to support a finding of obviousness, absent further evidence relating to filament dispersion and filament length retention. Moreover, the PTO considered all the prior art references discussed herein during the reexamination proceedings, and ruled that the '450 and '889 patents are not invalid in light of the prior art.

For the reasons discussed above, the court will deny RTP's motion for judgment as a matter of law that claim 1 of the '450 patent, as reexamined, is invalid for obviousness. The court will grant LNP's motion for judgment as a matter of law that claim 3 of the '262 patent and claim 1 of the '889 patent, as reexamined, are not invalid for obviousness.

### 5. RTP's defense that it is practicing the Hawley prior art invention

 RTP insists that it is not liable to LNP because it is practicing the Hawley prior art invention. As is described above, the law does not permit an alleged infringer to defend itself against a charge of patent infringement by asserting that he practices the prior art. See 35 U.S.C. § 282. This purported defense, the court notes, has no basis in the jury instructions. Because Lupo repeatedly told the jury in closing arguments that RTP cannot be liable because it practices the prior art, the court herein addresses three legal theories under which RTP's assertion might be relevant.

First, it may be the case that RTP is practicing the Hawley invention, and that the Hawley invention anticipates LNP's patents, or renders the LNP patents obvious. As described in this opinion, however, RTP has not met its burden of clear and convincing evidence to show that the Hawley invention anticipates the patents at issue, or renders them obvious.

Second, it may be the case that RTP is practicing the Hawley invention, and that this technology does not infringe the patents at issue. However, LNP has presented substantial evidence, as described above, that shows that its patents read on RTP's technology.

Third, it is possible that RTP is not practicing the Hawley invention. RTP states that it acquired the know-how to practice the Hawley invention in approximately 1981 when Hawley disclosed his invention to Fiberite, and when Hawley allowed Fiberite personnel to tour the PCI plant. As evidence that it continues to practice the Hawley invention, more than a

decade after this initial technology transfer, RTP points to flexural modulus data to suggest that the physical characteristics of the two companies' products are the same. While such flexural modulus data is relevant to the question of whether RTP is practicing the prior art, it alone does not demonstrate that RTP is practicing the Hawley invention. RTP, using a different process, could produce plastics with flexural modulus characteristics similar to those of the Hawley invention. Furthermore, RTP failed to rebut the evidence presented by LNP that RTP does not, in fact, practice the Hawley invention. LNP introduced at trial an admission made by McCamley in a 1992 letter to McDermott, Will & Emery that RTP's wet-out process "is different in concept/design to the ICI patent and to the PCI/Celanese or AKZO patents." The court notes that it is plausible, especially in light of the McCamley statement, that RTP is not practicing the Hawley invention. Thus, even if it were legally relevant that RTP is practicing the Hawley invention, RTP has not shown that it is practicing this technology.

### 6. *Damages and willfulness*

Because the court finds that the jury did not sufficiently apprehend the scope of the claims at issue, the jury's conclusions on damages and willfulness cannot stand. LNP's motion for a new trial on damages and willfulness is granted. RTP's motion for judgment as a matter of law that LNP should be barred from presenting damages testimony lacks procedural foundation, and is denied.

### 7. *Claim 1 of the '262 patent*

LNP has filed a motion for summary judgment that RTP's accused products infringe claim 1 of the '262 patent. Matters of fact preclude the court from granting summary judgment, and so LNP's motion is denied. In particular, the court notes that Gibson's testimony that the prior art disclosed LFRTs exhibiting 78% of the theoretically attainable flexural modulus raises questions as to the validity of claim 1 of the '262 patent.

### 8. *Inequitable conduct*

LNP has filed a motion pursuant to Rules 52 and 56 of the Federal Rules of Civil Procedure seeking judgment, or in the alternative, summary judgment, that the patents at issue are not unenforceable for inequitable conduct.

In its responses to interrogatories on the topic of inequitable conduct, RTP stated that it is premising its inequitable conduct defense on the alleged failure of Kawasaki to disclose Japanese publication No. 56–5714 (the '5714 Japanese reference) to the PTO during the reexamination of the '450 and the '889 patents. LNP notes that RTP did not present evidence of the relevancy of this reference during the invalidity phase of the trial. As such, LNP argues that it is entitled to judgment or summary judgment that the patents are not unenforceable for inequitable conduct.

In its September 3, 1998 pre-trial conference, the court expressly reserved the issue of inequitable conduct for a bench trial to take place after the jury trial. The court at no time required RTP to present evidence concerning its inequitable conduct defense during the jury trial. Although RTP could have raised the materiality of the '5714 Japanese reference during the invalidity phase of the jury trial, RTP had no obligation to do so. Because RTP is entitled to present additional evidence supporting its inequitable conduct defense, LNP's motion for judgment or, in the alternative, summary judgment is untimely, and is denied.

### 9. *Best Mode*

The parties have filed cross-motions for summary judgment on the issue of the best mode defense. LNP argues that the interrogatory responses filed by RTP cannot support a best mode violation. RTP, on the other hand, contends that the evidence shows that the primary inventor believed there was a best mode for achieving the claimed invention, and that the specification fails to recite this embodiment.

RTP has the burden to show by clear and convincing evidence that the patents at issue are invalid for failure to disclose the best mode. *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1459 (Fed. Cir.1984). As such, RTP must show that no reasonable jury could find that the patents disclosed the best mode. *See Mycogen Plant Science, Inc. v. Monsanto Co.*, 61 F.Supp.2d 199 (D.Del.1999). For LNP to prevail, it must demonstrate the absence of all genuine issues of material fact. *Avia Group International, Inc., v. L.A. Gear California*, 853 F.2d 1557, 1560 (Fed.Cir. 1988).

The court finds that there are issues of material fact that preclude the court from granting summary judgment in favor of either party. These issues include whether all three co-inventors contemplated the best mode identified by RTP, and whether the techniques identified by RTP are merely production details that need not be disclosed. For this reason, both parties' motions for summary judgment on the issue of best mode are denied.

### III. CONCLUSION

For the reasons stated above, the court rules as follows: 1) RTP's motion for reconsideration of the court's claim construction is denied; 2) LNP's motion for a new trial on the question of infringement of claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined, is granted; 3) LNP's motion for judgment as a matter of law as to infringement of claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined is granted; 4) LNP's motion for judgment as a matter of law that claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined are not invalid for indefiniteness is granted; 5) RTP's motion for judgment as a matter of law that claim 1 of the '889 patent, as reexamined, is invalid for lack of a written description is granted; 6) RTP's motion for judgment as a matter of law that claim 3 of the '262 patent; claim 1 of the '450 patent, as reexamined; and claim 1 of the '889 patent, as reexamined are invalid for anticipation is denied; 7) LNP's motion for a new trial on the issue of obviousness is granted; 8) LNP's motion for judgment as a matter of law that claim 3 of the '262 patent and claim 1 of the '889 patent, as reexamined, are not invalid for obviousness is granted; 9) RTP's motion for judgment as a matter of law that claim 3 of the '262 patent and claim 1 of the '889 patent, as reexamined, are invalid for obviousness is denied; 10) LNP's motion for a new trial on damages and willfulness is granted; 11) LNP's motion for summary judgment as to infringement of claim 1 of the '262 patent is denied; 12) LNP's motion for judgment or summary judgment that the patents at issue are not unenforceable for inequitable conduct is denied; 13) LNP's motion for summary judgment that the patents at issue are not invalid for failure to disclose the best mode is denied; and 14) RTP's motion for summary judgment that the patents at issue are invalid for failure to disclose the best mode is denied.

The court will enter an Order in accordance with this Opinion.